(No. 89220.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TYRONE FULLER, Appellant.

*Opinion filed February 22, 2002.*

HARRISON, C.J., and KILBRIDE, J., concurring in part and dissenting in part.

Charles Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

The defendant, Tyrone Fuller, pled guilty in the circuit court of Cook County to three counts of first degree murder, one count of attempted murder, and one count of armed robbery, in connection with the robbery of a jewelry store and the shooting death of Marc Feldman, the owner of the store. At the conclusion of a sentencing hearing, a jury found that the defendant was eligible for the death penalty based on the statutory aggravating factor that the murder was committed in the course of an armed robbery. 720 ILCS 5/9—1(b)(6) (West 1996). Following a hearing in aggravation and mitigation, the same jury found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial court sentenced the defendant to death.

The defendant's death sentence has been stayed pending direct review by this court. See Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). In this appeal of the defendant's convictions and death sentence, the defendant raises 12 issues, including (1) that the trial court improperly admonished him as to the maximum penalty on two of the murder counts at the guilty plea hearing, (2) that his trial counsel was ineffective because he allowed the defendant to plead guilty to counts of knowing and intentional first degree murder, and (3) that the trial court failed to properly instruct the jury on the requisite mental states to prove death eligibility on a felony-murder count. For the reasons that follow, we affirm the defendant's convictions in part and vacate in part. Furthermore, we vacate the defendant's death sentence and remand the cause for a new death-eligibility hearing.

## BACKGROUND

At a hearing on December 1, 1999, defense counsel informed the trial court that after extensive conversations with his client, the defendant had decided to waive his right to a jury trial and wanted to enter blind pleas of guilty to all pending charges. At that point, the trial court read the various charges of the indictment and asked the defendant if he understood each of those charges. With respect to the murder charges of the indictment, count I alleged that the defendant shot Marc Feldman in the head with a handgun without lawful justification and with the intent to kill him, thereby causing his death. Count II alleged that the defendant shot and killed Feldman knowing that his act created a strong probability of death, and count III alleged that the defendant shot and killed Feldman while committing a forcible felony, armed robbery. The defendant responded that he understood each of the charges. In addition, the trial court admonished the defendant concerning the possible penalties,

including the possibility of a death sentence for the felony murder charge described in count III. The court then explained the various phases of sentencing and that the defendant would be entitled to have a jury determine his eligibility for the death penalty.

As part of a factual basis for the pleas, the parties stipulated to the proposed testimony of various State witnesses. The State recited that Aaron Smith would testify that he was an employee of Marc Feldman, at a jewelry store located in Oak Park, Illinois. On December 18, 1997, he and Feldman were working at the store around 10 a.m., when the defendant entered the showroom with codefendant, Kimberly Britt. Feldman proceeded to show various items of jewelry to the defendant and Britt, while Smith remained in a back room of the store. At some point, Feldman came to the back room to get more jewelry.

As Feldman was returning to the showroom, Smith observed the defendant fire a gunshot, striking Feldman in the center of the forehead and causing him to fall to the ground. At that moment, the defendant jumped over the counter and came into the back room where Smith was located. Smith fell to the ground and the defendant placed his gun to Smith's head. Smith heard two clicks, but the gun did not fire. The defendant then ordered Smith to get underneath a desk. Smith observed the defendant and Britt take various items of jewelry and United States currency. The defendant then came toward Smith a second time, and he attempted twice to shoot Smith in the leg, but the gun again would not fire. The defendant and Britt then fled the scene. The next day, Smith identified the defendant and Britt from a live lineup as the perpetrators of the crimes committed the previous day.

The stipulated testimony of other State witnesses would show that following the crimes, an Oak Park police

officer responded to a radio transmission of an armed robbery in progress. The officer observed the getaway car and pursued it at a high rate of speed until it crashed into a railroad pylon. The defendant and Britt were passengers in the vehicle, which had been driven by Eric Hughes. The defendant exited the vehicle after it crashed, holding a handgun. The officer drew his gun and ordered the defendant to stop. At that point, the defendant dropped his gun and fled. Police found the defendant a short time later hiding under a porch and he was arrested. Defendant had jewelry from the store in his possession and was wearing a torn surgical glove on his right hand at the time of the arrest. The torn glove worn by the defendant matched exactly the ripped portions recovered from the cash register at the crime scene of the jewelry store. A ballistics expert determined that the gun dropped by the defendant and recovered by police fired the bullet that killed Feldman.

Additionally, the defendant's 36-page court-reported confession was stipulated to and entered into evidence. In that statement, the defendant admitted that he went to the jewelry store on the morning in question to commit a robbery. The defendant further admitted that when Feldman came out of the back room, the defendant reached into his pocket for his gun and pulled it out. The defendant raised the gun and it went off. After the bullet hit Feldman, causing him to fall to the floor, the defendant jumped over the counter and went into the back room. He let Britt into the back room through another door and told Smith to sit by a desk. The defendant and Britt then proceeded to place jewelry and cash inside a bag. The defendant acknowledged that he put on latex medical gloves that he brought with him to the store because he did not want to leave any fingerprints. The defendant and Britt took the "loot" from the scene and fled in the getaway car driven by Hughes.

After hearing a factual basis for the defendant's pleas, the trial court accepted the pleas and found the defendant guilty of all charges. Following the empaneling of the jury, the case proceeded to the eligibility phase of the bifurcated capital sentencing hearing. The State sought to have the defendant declared death eligible based on the felony-murder provision contained in section 9—1(b)(6) of the Criminal Code of 1961 (the Criminal Code), which provides:

> "(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:
>
> * * *
>
> (6) the murdered individual was killed in the course of another felony if:
>
> (a) the murdered individual:
>
> (i) was actually killed by the defendant, ***
> (ii) *** and
>
> (b) *** *the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another*; and
>
> (c) the other felony was one of the following: armed robbery ***." (Emphasis added.) 720 ILCS 5/9—1(b)(6) (West 1996).

During his opening statement at the eligibility phase, defense counsel told the jurors that their job was "simple" and there was "nothing to dispute" as to what they had to do at the first phase because the defendant had admitted the crimes and pled guilty to the three separate ways that he was charged for this single murder. Defense counsel concluded by asking the jury to keep an open mind at the second phase of the sentencing proceeding.

At the eligibility hearing, several witnesses gave testimony that was substantially similar to the factual basis recitation given by the State at the guilty plea

proceeding. Melissa Peterson, the victim's fiancée, testified that Feldman left for work around 8 a.m. the day of the murder. Feldman told Peterson that he loved her, and that was the last time they spoke to one another. She noted that she was also scheduled to work that morning but did not do so because of a prior family engagement. Later that day, she learned that the store had been robbed and that Feldman had been murdered.

Aaron Smith, a 76-year-old employee of Feldman, testified that when he arrived at the jewelry store on the morning of the robbery and shooting, Feldman was already at the store waiting on the defendant and a female companion of the defendant. Smith made coffee and waited on a blind lady who had entered the store. After the blind lady left, Feldman came to the back room to retrieve a pair of earrings to show the defendant. Smith told Feldman that he thought that something was wrong because the couple had been in the store for such a long time. Feldman reassured Smith that he knew the defendant and that he was a regular customer.

Smith stated that when Feldman stepped around the corner to go back into the showroom, the defendant shot Feldman in the head. Feldman fell to the ground in a location that made it impossible for Smith to shut the door to the back room. After the defendant shot Feldman, he jumped over the counter and came into the back of the store. Smith ran toward the back of the store, but tripped and fell. When Smith fell, the defendant came over the top of him and placed a gun to Smith's head. As Smith begged for his life, he heard two clicks, but the defendant's gun would not fire. After the second click, the defendant called Smith a "mother f-----" and ordered him to get under a desk. After the defendant and his female companion loaded a bag full of jewelry and emptied out the store safe, the defendant told Smith to lie down and that he was going to shoot him in the leg.

Because Smith was lying down, he could not see how the defendant was pointing the gun, but Smith did hear it click again.

On cross-examination, Smith testified that store records revealed that the defendant was a customer of the store. Smith acknowledged that he did not actually see the defendant point the gun or pull the trigger, but he did hear the shot that killed Feldman.

Oak Park police Detective Arthur Borchers testified that the murder weapon was a .25-caliber semiautomatic pistol. He noted that in order to fire the weapon, a person would have to put a magazine in and operate the slide by pulling it back to load it. He further noted that if the gun were loaded and it was not chambering a bullet while the trigger was being pulled and clicked, there would have to be some malfunction with the magazine.

On cross-examination, Borchers stated that he found a shotgun about 10 feet from the safe at the jewelry store. He further stated that a semiautomatic weapon is more sensitive in some of its functions and that it is generally easier to fire a round when pulling the trigger than it would be with a revolver.

Assistant State's Attorney Colin Simpson testified on behalf of the State that after the defendant was taken into custody on the day of the offenses, he talked with the defendant about the events that had transpired that day. Simpson's testimony substantially recounted much of the matter covered by the defendant's written statement. According to Simpson, the defendant appeared calm at the time of his statement, and his speech was clear. Simpson noted that the defendant initially blamed Smith, the 76-year-old store employee, for planning the armed robbery. However, after Simpson informed the defendant later in the evening that he had been identified in a live lineup, the defendant admitted that he, Britt and Hughes had planned the crime for about two

weeks. The defendant further told Simpson how he shot Feldman:

"A. [Witness] *** So I said, 'What happened next?' [The defendant] said, 'The owner said he was going to go into the back room and try and figure out how much it was going to cost.' I said, 'Did the owner go into the back room?' He said, 'Yes.' I said, 'Did the owner come out of the back room?' He said, 'Yes.' *** [I said,] 'What happened at that time?' He said, 'I put my hands in the coat and I brought out a gun and the gun went off.'

MR. BAKER [Assistant State's Attorney]: Just indicating for the record he raised his hand and arm straight from his shoulder in a forward fashion.

THE WITNESS: I said, 'When the gun went off what happened?' [The defendant] answered, 'The man was hit and he dropped straight down.' "

On cross-examination, the following colloquy between Simpson and defense counsel took place:

"Q. All right. [The defendant] also told you that he reached into his pocket at the gun? Is that right?

A. He reached into his pocket and pulled out the gun.

Q. Those are his exact words, he reached into his pocket at the gun, and then pulled it out, and he said these words to you in that conversation before you, 'I pulled it out and I went to raise it and it went off.' Were those his exact words?

A. Those are the words he said, correct.

Q. Mr. Simpson, he never told you that he intentionally pulled the trigger of that gun, did he?

A. No, sir.

Q. And you never asked him if he pulled the trigger to that gun, did you?

A. No, sir."

At the conclusion of the first phase of the sentencing hearing, the jury found the defendant eligible for the death penalty. The cause then proceeded to the hearing in aggravation and mitigation. During his opening statement at this second stage of the sentencing proceedings, defense counsel did not argue that the shooting of Feldman was an accident, but he instead told the jury that

the defendant had taken full responsibility for his crimes by pleading guilty, that the defendant's crimes stemmed from his drug addiction, and that the defendant is now sober and can be a lesson to his children.

The State presented evidence in aggravation that the defendant was convicted of unlawful possession of a weapon in 1992, and that in December of that year, the defendant and Britt robbed Sandra Cooper and her eight-year-old daughter at knifepoint when the victims attempted to leave a shopping mall. The defendant was convicted of armed robbery for that crime and was on parole at the time he committed the instant offenses. The State also presented victim impact evidence. Marc Feldman's fiancée, mother and sister each read victim impact statements into the record.

The defendant's case in mitigation consisted of the testimony of six witnesses, including the defendant. The defendant's brother, a Cook County correctional department sheriff, testified that the defendant's behavior began to deteriorate when he became addicted to heroin around the age of 17 or 18. He noted that after being released from prison after serving his sentence for the first armed robbery, the defendant became employed at a legal consulting firm. The defendant was employed there for about two years until a criminal background check resulted in his dismissal. At that point, the defendant became reacquainted with Britt and began to slide into heroin addiction once again.

The defendant's mother testified that she had successfully raised her other three children and that the defendant was her only child to have problems with the law. She noted that the defendant had been a good child and had never been cruel or given her any problems. She too noted that the defendant's problems were tied to his association with Britt and his use of drugs. She stated that the defendant could be a useful citizen even in

prison if he was not sentenced to death. Other family members also testified on behalf of the defendant that if he was not on drugs he could be a good father to his five children and encourage other young men not to make the same mistakes that he had.

The defendant was the last witness to testify in mitigation. He acknowledged that taking Feldman's life was wrong and asked the victim's family for forgiveness. He stated that his addiction to heroin had affected him mentally and physically, but that he had been drug free the past two years while in jail. When he was released from prison the first time, he obtained a job at a law firm, but lost that job because of a criminal background check. He then began abusing heroin once again and was using up to one gram per day.

The defendant further testified that before committing the crimes in this case he spent the night snorting heroin and drinking cognac. He stated that about two weeks before the day in question, he had talked to Hughes and Britt about robbing the jewelry store. However, on the morning of the crime he did not discuss robbing the store. When he was asked what led to his taking the gun out of his pocket, the defendant claimed that he drew the gun because he was intoxicated and was angry because Feldman could not find his jewelry that he had on pawn. The defendant claimed that Feldman made a move and the gun went off. The defendant then testified as follows:

"Q. How did the gun go off? You took it from your pocket and it went off?

A. Right. When I brung it out of my pocket, my finger was on the trigger.

Q. So you were strung out, stoned and drunk?

A. Yes.

Q. Walking around with a live gun?

A. Yes.

Q. You confessed to the crime the next day, is that right?

A. Yes.

Q. And then you pled guilty in this courtroom on a previous occasion, is that right?

A. Yes.

Q. Do you feel remorseful for what you did?

A. Yes."

On cross-examination, the defendant was asked by the prosecutor if he was insisting that it was an accident when he shot Feldman. The defendant answered, "I pled guilty to first degree murder. Marc Feldman died at my hands." When pressed further about his intent to shoot Feldman, the following exchange took place:

"Q. That's not my question.

A. And I pled guilty to it.

Q. My question is surrounding the facts of what happened. Are you stating today that when you shot Marc Feldman it was an accident?

A. Yes.

Q. So you are still not admitting that you killed Marc Feldman intentionally, isn't that correct?

A. Yes.

Q. But you pled guilty to first degree murder, intentional murder, is that right?

A. First degree murder, yes.

Q. So as of today, two years later, you are still not admitting your full involvement in this crime, isn't that correct?

A. I admitted it when I signed the paper to plead guilty.

Q. But you are telling me today it was an accident.

A. Regardless.

Q. You either intended to kill him or it was an accident.

A. Regardless he died at my hands.

Q. Was it an accident or did you intend to kill him?

A. It was an accident.

Q. It was an accident, okay.

You are telling me it was an accident, that your gun shot and hit him directly in the forehead?

A. Yes."

On redirect examination, the defendant testified that he did not even remember what precisely happened that day. He stated that it was not his intent to shoot the

victim when he pulled his gun out that day. The gun went off and therefore he caused the victim's death and felt responsible. He stated that he pled guilty because he felt remorseful and did not want to tie up the courtroom for weeks or months over something for which he felt responsible. He also stated that he pled guilty because he did not want to put the Feldman family through a murder trial where he would be denying something.

In his closing argument to the jury, which encompasses 15 pages of the transcript from the sentencing hearing, defense counsel emphasized that the defendant's crime was the result of his drug addiction and that if he was not sentenced to death he could be a role model to others of what not to become. Defense counsel also noted that the defendant had taken full responsibility for his crimes by pleading guilty and that that showed his remorse. Furthermore, he stated that if the defendant had not pled guilty, the prosecutor would be arguing that the defendant was not remorseful. Defense counsel also told the jury that the defendant had shown great remorse by taking the position that he was responsible for the crime no matter how it happened, whether it was an accident or not.

At the close of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court subsequently sentenced the defendant to death for the felony-murder conviction. The trial court denied the defendant's post-sentencing motions to withdraw his guilty pleas or to have a new sentencing hearing.

## ANALYSIS

### I. Adequacy of the Admonishments

The defendant first argues on appeal that the trial judge improperly admonished him that the maximum sentence for the murder offenses in counts I and II (the

intentional and knowing counts) of the indictment was a term of imprisonment rather than death. In order to satisfy due process, a guilty plea must be affirmatively shown to have been made voluntarily and intelligently. *People v. Burt*, 168 Ill. 2d 49, 64 (1995), citing *Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969). Supreme Court Rule 402 (177 Ill. 2d R. 402) was adopted to ensure compliance with these due process requirements. *Burt*, 168 Ill. 2d at 64. The rule provides in relevant part that a court may not accept a guilty plea until a defendant has been admonished as to the "minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences." 177 Ill. 2d R. 402(a)(2). The defendant acknowledges that the trial judge properly admonished him that the maximum sentence for felony murder, count III of the indictment, was death, but he contends that the judge helped to confuse him by characterizing that felony-murder count as "capital murder." The defendant maintains that the judge's improper admonishment combined with the reference to "capital murder" misled him to believe that his plea to felony murder alone established all of the elements necessary to satisfy his eligibility for the death penalty.

In response, the State initially argues that because the defendant did not allege in either of his post-sentencing motions a deficiency in the admonishments provided to him at the time of his guilty plea, the defendant has waived the issue on appeal. Under Supreme Court Rule 604(d), any issue not raised in a motion to withdraw a guilty plea is waived. 188 Ill. 2d R. 604(d). However, if a trial court fails to give the defendant the admonishments required by Rule 402, it is possible that this action can amount to plain error, an exception to the waiver rule, as set forth in Supreme Court Rule

615(a) (134 Ill. 2d R. 615(a)). Before invoking the plain error exception, however, we determine whether any reversible error occurred. *People v. Chapman*, 194 Ill. 2d 186, 226 (2000).

The failure to properly admonish a defendant, standing alone, does not automatically establish grounds for reversing the judgment or vacating the plea. *People v. Davis*, 145 Ill. 2d 240, 250 (1991). Substantial compliance with Rule 402 is sufficient to establish due process. *Burt*, 168 Ill. 2d at 64. Moreover, whether reversal is required for an imperfect admonishment depends on whether real justice has been denied or whether the defendant has been prejudiced by the inadequate admonishment. *Davis*, 145 Ill. 2d at 250. Additionally, we may consider the entire record in order to determine whether the defendant understood the nature of the charges against him. *Burt*, 168 Ill. 2d at 64.

In the present case, the defendant argues that the maximum penalty for first degree murder is death, while the State contends that for admonishment purposes, the maximum sentence for the crime is a term of imprisonment when the State is not seeking the death penalty on the particular count of murder in question and there are no aggravating factors that would arguably make the defendant eligible for the death penalty on that count. Neither party cites any case law in support of their respective positions. Section 5—8—1(a)(1)(a) of the Unified Code of Corrections (the Code) provides the following:

> "Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>> (1) for first degree murder,
>>> (a) a term shall be not less than 20 years and not more than 60 years[.]" 730 ILCS 5/5—8—1(a)(1)(a) (West 1996).

Pursuant to section 5—8—1(a)(1)(b) of the Code, a defendant can receive a life sentence if "the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present ***." 730 ILCS 5/5—8—1(a)(1)(b) (West 1996). A defendant can receive life imprisonment under section 5—8—1(a)(1)(c) only in a case where the death penalty is not imposed, and only if previously convicted of murder, or if found guilty of murdering certain enumerated classes of individuals. 730 ILCS 5/5—8—1(a)(1)(c) (West 1996). Furthermore, a defendant can receive the death penalty for a conviction on a murder count only upon a finding of at least one statutory aggravating factor listed in section 9—1(b) of the Criminal Code. 720 ILCS 5/9—1(b) (West 1996).

Additionally, under section 5—8—2(a) of the Code, a defendant can be sentenced to an extended-term sentence for murder. That section provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in [section 5—5—3.2(b)] were found to be present." 730 ILCS 5/5—8—2(a) (West 1996).

Section 5—5—3.2(b) of the Code provides in relevant part:

"The following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender:

\* \* \*

(7) When a defendant is convicted of first degree murder, after having been previously convicted in Illinois of any offense listed under [section 5—5—3(c)(2) of the Code], when such conviction has occurred within 10 years after the previous conviction, excluding time

spent in custody, and such charges are separately brought and tried and arise out of different series of acts[.]" 730 ILCS 5/5—5—3.2(b) (West 1996).

Section 5—5—3(c)(2) of the Code lists any offense that is a Class II felony or greater (730 ILCS 5/5—5—3(c)(2) (West 1996)), and therefore a defendant would be eligible for an extended-term sentence for a murder conviction if he had a previous Class II or greater felony conviction within the past 10 years (730 ILCS 5/5—5—3.2(b) (West 1996)). If such a factor is present, a defendant may be sentenced for first degree murder to "a term [that] shall be not less than 60 years and not more than 100 years." 730 ILCS 5/5—8—2(a)(1) (West 1996).

Turning to the admonishments given at the guilty plea proceeding in the present case, we note that the trial judge read the essence of the intentional and knowing murder counts as described in the indictment, including the requisite mental states required to prove those offenses. When the judge asked the defendant if he understood the nature of those charges, the defendant responded that he did. The judge then admonished the defendant that the intentional and knowing first degree murder charges carried a minimum penalty of 20 years and a maximum penalty of 60 years. The court further admonished the defendant that he could receive an extended term sentence of up to 100 years, depending upon whether there was proof of an aggravating factor of a prior conviction. The defendant responded that he understood this, and then pleaded guilty to the knowing and intentional murder counts.

The defendant was then admonished that he was charged with a third count of murder, which provided that he shot and killed Marc Feldman with a gun, during the course of a forcible felony, namely, armed robbery. The defendant stated that he understood the nature of the charge. He was then admonished that he could receive a sentence of between 20 and 60 years, or an

extended-term sentence of up to 100 years, or, *depending on the factors presented*, a sentence of natural life imprisonment, or a sentence of death. The judge then informed the defendant that the question of whether he was eligible for the death penalty would be determined by a jury and that if the defendant was found eligible there would be a second proceeding to determine if there were sufficient mitigating factors to preclude imposition of the death penalty. The defendant told the judge that he understood that admonishment.

The judge then asked defense counsel if there was anything he wished to add to make sure that the defendant understood the factors outlined in section 9—1 of the Criminal Code and the death penalty procedure. Defense counsel stated that he had nothing further to add. The judge then asked the defendant how he wanted to plead "to Count three, the count of capital murder?" The defendant responded, "Guilty." After further admonishments, the defendant told the court that he understood what a jury trial was and he was voluntarily waiving it. Defense counsel stated that he had explained to the defendant the right to a jury trial.

After reviewing the entire record in this case in view of the statutory scheme, we have determined that even if the theoretical maximum penalty for the intentional and knowing first degree murder counts in this case was death, the defendant did not suffer any prejudice as a result of the trial court's allegedly incomplete admonishment. Where a defendant who is convicted upon a plea of guilty is sentenced to the greatest maximum sentence with respect to a charge upon which he has been properly admonished as to the greatest maximum and minimum sentence and there are no consecutive sentences involved, failure to properly admonish the defendant on other counts does not amount to reversible error. See *People v. Wills*, 61 Ill. 2d 105, 109-10 (1975). The incompleteness

of the admonishment in this case was harmless given that the State was clearly seeking the death penalty on the felony-murder count and not on the other two murder counts. Moreover, the defendant was correctly admonished as to the maximum penalty on the felony-murder charge, and the defendant was not sentenced at all on the other two counts of murder. Therefore, the defendant was not in fact sentenced to a penalty beyond that set forth in the admonishments.

Additionally, we are not persuaded that the defendant was confused at the time he entered his pleas. Approximately seven months before the guilty plea proceeding, the defendant filed a motion to compel the prosecution to disclose whether it would seek the death penalty and a motion for a bill of particulars as to aggravation. In those motions, the defendant noted that the only conceivable basis upon which the State could seek the death penalty was that the killing occurred during the course of an armed robbery and that the State would have to prove that the defendant intended to kill the victim in this case. In both a written motion in response to the defendant's motions and at a hearing held on the motions, the State responded that it would seek the death penalty in relation to the felony-murder count. The State noted that it could prevail in its attempt to declare the defendant death eligible in relation to the felony-murder charge if it proved either that the defendant acted intentionally or knowingly, citing section 9—1(b)(6)(b) of the Criminal Code (720 ILCS 5/9—1(b)(6)(b) (West 1996)), which lists the required mental states for death eligibility based on felony murder. Following the hearing on the matter, the defendant's motion to preclude the death penalty procedure was denied. The State remained true to its previous representations and subsequently sought the death penalty at the eligibility phase solely in relation to the felony-murder aggravating factor.

The defendant concedes on appeal, and we agree, that there is no requirement that a trial judge admonish a defendant that his plea to intentional murder could serve to help prove his death penalty eligibility. Moreover, the judge was not required to instruct and admonish the defendant on the differences among the various subsections of the murder statute. *Stewart v. Peters*, 958 F.2d 1379, 1386 (7th Cir. 1992). There is a presumption that defense counsel informed the defendant on these matters. *Stewart*, 958 F.2d at 1386, citing *Marshall v. Lonberger*, 459 U.S. 422, 436-37, 74 L. Ed. 2d 646, 660, 103 S. Ct. 843, 852 (1983); *Henderson v. Morgan*, 426 U.S. 637, 647, 49 L. Ed. 2d 108, 115-16, 96 S. Ct. 2253, 2258 (1976). Arguably, counsel would be ineffective if he did not. In this case, however, there is no support in the record for the defendant's claims that he was not properly informed of the consequences of his guilty pleas. Given that the defendant's allegation to the contrary is *de hors* the record and was not properly raised or resolved in a post-plea proceeding, the defendant has not overcome the presumption that counsel properly informed the defendant of the elements necessary to make him death eligible. Instead, we find on the record before us, and as discussed more fully below, that the defendant's pleas were part of an overall strategy to take responsibility for his crimes and throw himself at the mercy of the jury at the second phase of sentencing.

The defendant also argues that he was confused by the trial judge's reference to the felony-murder charge as "capital murder." However, we find no merit to that contention. From the context of the record at the plea proceeding, it is clear that the judge merely used the term "capital murder" to point out the potential sentence of death in the event the defendant was found to be eligible for a capital sentence by the jury at the sentencing hearing. In fact, the judge informed the defendant

that he was entitled to have a jury determine his eligibility for the death penalty in connection with that charge. The phrase "capital murder" has been used by courts to describe felony murder when, under the circumstances of the case, it could expose the defendant to the death penalty. See, *e.g.*, *People v. Chapman*, 194 Ill. 2d 186, 223-24 (2000); *People v. Peete*, 318 Ill. App. 3d 961, 971 (2001); *Stewart*, 958 F.2d at 1386. Under the circumstances of the present case, we find that the defendant did not suffer any prejudice as a result of the judge's reference to "capital murder."

## II. Effectiveness of Guilty Plea Counsel

The defendant next argues that his counsel was ineffective because he allowed the defendant to plead guilty to intentional and knowing murder, even though the defendant's confession to the police indicated only that the "gun went off" and the defendant testified at the second phase of his sentencing hearing that he accidentally shot the victim and did not intend to kill him. The defendant argues that his counsel was ignorant of the mental states necessary to establish death penalty eligibility under section 9—1(b)(6) of the Criminal Code (720 ILCS 5/9—1(b)(6) (West 1996)). He contends that counsel's ignorance is demonstrated by a series of alleged omissions: (1) counsel failed to object to the absence of the mental states in the issues instruction for the felony-murder count at the eligibility hearing, or tender a correct instruction; (2) counsel failed to object to the prosecutors's argument omitting the mental states; (3) counsel failed to present defendant's testimony that the shot was an accident at the eligibility stage when it would have been relevant to eligibility; (4) counsel essentially conceded the defendant's eligibility for a death sentence rather than arguing that the shooting was an accident; (5) there is no indication from the record that counsel investigated the defendant's claim that the shooting was

an accident; and (6) in the preplea proceedings, counsel filed a motion seeking to preclude imposition of the death penalty, which did not cite the Illinois statute setting forth the appropriate mental states, but instead argued pursuant to *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), that the defendant could not be sentenced to death without an intent to kill. In support of his position, the defendant argues that this case is similar to *People v. Pugh*, 157 Ill. 2d 1 (1993), where this court found that the defendant was prejudiced by his counsel's misapprehension of the law and was therefore entitled to a new death eligibility and sentencing hearing.

A court is not precluded from accepting a plea of guilty, in spite of a defendant's claim of innocence, if the record reflects a factual basis from which a jury could find the defendant guilty of the offenses to which the plea was entered. *Pugh*, 157 Ill. 2d at 25. A plea based on the reasonably competent advice of counsel is an intelligent plea not open to attack on the grounds that counsel erred in his judgment. *People v. Palmer*, 162 Ill. 2d 465, 475, 476 (1994). To prevail on a claim of ineffective assistance of counsel in entering a plea of guilty, the same two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), is applicable. *Palmer*, 162 Ill. 2d at 475; *Hill v. Lockhart*, 474 U.S. 52, 57, 88 L. Ed. 2d 203, 209, 106 S. Ct. 366, 369-70 (1985).

To satisfy the first prong of the *Strickland* standard in a case where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the defendant must show that his counsel's advice fell below an objective standard of reasonableness, and not whether a court would in retrospect consider the advice to be right or wrong. *People v. Jones*, 144 Ill. 2d 242, 254 (1991). In recognition of the

variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review. *Roe v. Flores-Ortega*, 528 U.S. 470, 477, 145 L. Ed. 2d 985, 995, 120 S. Ct. 1029, 1034-35 (2000); *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent. *Palmer*, 162 Ill. 2d at 476. Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of ineffective assistance of counsel. *Palmer*, 162 Ill. 2d at 476, 479.

In order to establish the "prejudice" requirement in such cases, a defendant must show that there is a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial. *Pugh*, 157 Ill. 2d at 15; *Hill*, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370-71. As the Court in *Hill* observed, the question of prejudice depends in large part on a prediction of whether the defendant likely would have succeeded at trial:

> "In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, *** where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370-71.

The defendant's principal contention in his argument

that his counsel was ineffective in advising him to plead guilty is that counsel was operating under a misapprehension of the law as to the culpable mental state necessary for a finding of death eligibility based on the felony-murder aggravating factor as set forth in section 9—1(b)(6) of the Criminal Code (720 ILCS 5/9—1(b)(6) (West 1996)). To establish this aggravating factor, the State must prove that the defendant acted with the intent to kill or that he acted knowing his conduct created a strong probability that the victim would die or suffer great bodily harm. 720 ILCS 5/9—1(b)(6) (West 1996).

After carefully examining the record, however, we find no indication that defense counsel did not understand the law at the time the guilty pleas were entered. There is no admission from defense counsel that he did not understand the law, and he has not filed an affidavit to that effect. As previously noted, the defendant's motion to preclude the death penalty indicated that to declare the defendant death eligible on the basis of felony murder, the State would have to show that the defendant intended to kill the victim. Defense counsel asserted at that time that the State had no evidence in its possession that would show that the defendant intended to kill the victim. In response, the State filed a written motion and the issue was argued at a hearing. In its written motion and at the hearing, the State cited Illinois statutory law, section 9—1(b)(6), and pointed out that the defendant could be death eligible for felony murder if the State showed that the defendant had knowledge that his conduct created a strong probability of death (720 ILCS 5/9—1(b)(6)(b) (West 1996)). The State also cited *People v. King*, 109 Ill. 2d 514 (1986), noting that in that case the court held that the knowledge element of section 9—1(b)(6) could support a death eligibility finding where the defendant's "gun went off" when the victim jerked

away. In *King*, the shooting occurred as the defendant walked the victim to the back of the store while holding a loaded gun to the victim's head. See *King*, 109 Ill. 2d at 522, 542.

The hearing on the defendant's motion to preclude the death penalty occurred some seven months before the defendant's guilty pleas. Thus, it is apparent from the record that defense counsel was well aware of the mental states required to prove felony murder long before the defendant's pleas were entered. Based on the fact that there was some indication in the record that the defendant pointed a loaded gun in the direction of the victim in anger, defense counsel could have reasonably concluded that it was best to plead guilty to all charges as a matter of strategy because of the likely possibility that the defendant would have been found death eligible based on the knowledge element, similar to the defendant in *King*, 109 Ill. 2d 514.

Furthermore, we believe that instead of indicating a misapprehension of the law, the alleged omissions of defense counsel cited by the defendant were consistent with his counsel's strategy to have the defendant take full responsibility for his crimes by pleading guilty and then use that to show his remorse to the jury in hopes of avoiding the death penalty at the final phase of sentencing. Defense counsel expressed that strategy during his closing argument at the aggravation and mitigation phase as follows:

"It was an all or nothing proposition. He wanted to take responsibility so he took it all, and he took the stand and told you about it. He is remorseful. ***

***

When he killed him, he pointed the gun at him, pulled the trigger and shot him or *** it went off when he took it [out], he accepted the blame. He stepped up to the plate and said, 'I did it,' *** It's one or the other. He pled guilty or he didn't plead guilty.

\* \* \*

How much more remorse can you have than saying yeah, I did it no matter how it happened. He doesn't even remember how the hell it happened. He was whacked out, and it was a dream, it was a blur.

He thinks about it every day, all the time, but, you know, he is not the same type of brain as you folks are when you are sober. You can remember events, things that happened. To him, he screwed up the cause of death and he accepted responsibility and that's what he remembers.

Why would he even want to lie now? There is no more reason to. I did it. He just doesn't know how he did it. Maybe he can't face how he did it but he accepted the fact that he did it and he told you all that. He can't remember how it happened start to finish. He was stoned.

Ladies and gentlemen, don't say he did not show remorse. What more remorse can you have? \*\*\*

Did you hear me yesterday trying to argue with you that he was not death eligible? No, I wasn't trying to sell you a load of goods. I told you your job is simple, and today is the hard part, and I told you the truth."

The defendant argues that defense counsel could have pursued the same strategy of taking responsibility if he would have advised the defendant to plead guilty to felony murder, yet insist on a guilt-phase trial on the intentional and knowing murder counts and then contest death eligibility. The defendant's suggestion is an invitation to view counsel's strategy with precisely the sort of hindsight prohibited by *Strickland*. Although pleading guilty to the felony-murder count only, and then contesting eligibility, would certainly have been a reasonable trial strategy, it would not have allowed defense counsel to argue that the defendant had taken *full* responsibility for the crimes no matter how they happened. Based on the record before us, we can only conclude that defense counsel took a calculated and informed risk to have the defendant throw himself on the mercy of the jury at the final phase of sentencing. See *Palmer*, 162 Ill. 2d at 482 (counsel found not to be ineffective where it was counsel's

strategy not to pursue plea negotiations but have defendant throw himself on the mercy of the court and enter blind pleas of guilty on three counts of murder which established his death eligibility based on felony murder).

The defendant also argues that it was unsound strategy not to contest eligibility, but then later give testimony as to the accidental nature of the shooting. It is true that defendant's trial counsel attempted through his cross-examination and closing argument to suggest that the killing may have been an accident. However, we view counsel's efforts as an attempt to ameliorate the harshness of the defendant's actions of shooting the victim in the forehead without giving him an opportunity to hand over valuables from the store. Counsel may well have believed that he could effectively argue that the defendant had taken full responsibility by pleading guilty while, at the same time, suggesting the possibility that the shooting was an accident. To the extent that the prosecutor saw the need to try and thwart that strategy by rigorously cross-examining the defendant as to the claimed accidental nature of the shooting, the potential for success that defense counsel's strategy possessed is underscored. At any rate, we will not in hindsight substitute our judgment for counsel's. "There are countless ways to provide effective assistance in any given case[;] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 695, 104 S. Ct. at 2065.

The defendant additionally asserts that counsel had a duty to make an investigation as to whether the shooting was an accident. Initially, we note that there is no evidence in the record from which it can be definitively concluded that defense counsel did not investigate the claim of accident. Nevertheless, even assuming that

defense counsel did not investigate, we note that such a decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. Moreover, counsel is allowed latitude to make a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. In this case, counsel was aware of the State's evidence about the functioning of the gun and that the malfunction of the gun showed that it had a problem with not firing when the trigger was pulled and not the opposite problem of firing without pulling the trigger. The defendant was also aware that the gun in question was a semiautomatic and that such weapons have a more sensitive trigger. The defendant does not explain how any further testing of the weapon would have affected his counsel's strategy. Under the circumstances, we find the defendant's argument to be unpersuasive.

*People v. Pugh*, 157 Ill. 2d 1 (1993), relied upon by the defendant, is distinguishable from the present case. In *Pugh*, the defendant shot the victim in the chest with a sawed-off shotgun during the course of an armed robbery. The defendant pled guilty to three counts of murder, including felony murder, in connection with the offense. At the guilty plea hearing, defense counsel referred to the defendant's pleas to knowing and intentional murder as "technical pleas" of guilty. Defense counsel subsequently stipulated to the defendant's death eligibility. The defendant testified at the second phase of the sentencing hearing that he did not intend to kill the victim. The defendant was thereafter sentenced to death on the felony-murder conviction. New counsel filed a post-plea motion to vacate the guilty plea, alleging, among other things, that defense counsel was ineffective because he did not understand that to receive the death

penalty for felony murder, the defendant must have intended to kill the victim. Additionally, new counsel presented the affidavit of previous defense counsel indicating that the defendant consistently told previous counsel that he did not intend to kill the victim and that counsel advised the defendant to plead guilty because he did not understand that a finding of felony murder by itself, in the absence of intent, was insufficient to render the defendant death eligible.

This court found that counsel was ineffective and vacated the defendant's death sentence and remanded for a new death eligibility hearing. *Pugh*, 157 Ill. 2d at 23. In so doing, this court held that the defendant's motion to preclude imposition of the death penalty, which did not refer to Illinois law, combined with defense counsel's affidavit, showed a lack of understanding of the law. *Pugh*, 157 Ill. 2d at 17-18.

This court in *Pugh* also rejected the State's argument that defense counsel's actions amounted to reasonable strategy, finding that the argument was not supported by the record. *Pugh*, 157 Ill. 2d at 19. Finally, this court found that the defendant was prejudiced by his counsel's lack of knowledge. In that regard, this court noted that "there is a reasonable probability that but for counsel's error, defendant would have rejected the stipulation to death penalty eligibility because defendant's evidence pointed to an accidental shooting." *Pugh*, 157 Ill. 2d at 20. The court continued by stating that "[n]one of defendant's evidence was presented by defense counsel at the first phase of sentencing because counsel believed such evidence was irrelevant once felony murder was established." *Pugh*, 157 Ill. 2d at 20. Further, other evidence brought out at the post-plea motion hearing would have discredited the prosecution's case. *Pugh*, 157 Ill. 2d at 20-21.

The present case is readily distinguishable from *Pugh*.

First, and most significantly, there is no affidavit from counsel in the present case that he did not understand the law. Second, no hearing was ever held in *Pugh* on the motion to preclude the death penalty, while in the present case, the State filed a response and, if there was any doubt before the hearing about defense counsel's knowledge of Illinois law, there could be none afterwards. Third, the defendant did not present any evidence in the post-plea proceedings to substantiate his claims that counsel did not know the law or that he failed to investigate. Thus, counsel's actions in this case are presumed to be due to trial strategy, unlike in *Pugh*, where they were clearly due to ignorance of the law. From our review of the instant record, we can conclude only that counsel in this case believed that a claim of accident would not have succeeded at the eligibility phase and that it was best to wait to throw the defendant at the mercy of the jury at sentencing.

Having concluded that counsel's decision to advise the defendant to plead guilty to the charges and not contest eligibility at sentencing was a matter of trial strategy, we note that the defendant's claim is defective for the additional reason that he did not suffer any prejudice as a result of the alleged deficiencies. Again, the question of whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial depends in large part on a prediction of whether the defendant would *likely* have succeeded at trial. *Hill*, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370-71.

In the present case, there was a great deal of circumstantial evidence indicating that the shooting was intentional. The victim was shot in the middle of the forehead immediately upon entering the showroom. The defendant confessed that he planned the robbery in advance, which leads to the question of how he planned to escape detection for the robbery if he did not plan to

kill the victim, given that he was a known customer with his information on file at the store. As previously noted, there was also some evidence from which it could be concluded that the defendant raised the gun and pointed it in the direction of the victim. Thus, there was a likely. possibility that the jury could have found at the very least that the defendant was death eligible because he acted with knowledge that his actions created a strong probability of death, as was the case in *People v. King*, 109 Ill. 2d 514 (1986).

Additionally, the defendant was not a good witness. He could have been impeached with the fact that he first tried to blame the planning of the robbery on Smith, the 76-year-old victim of the attempted murder in this case. The defendant's account of the shooting as stated in his confession would also not have likely been helpful to the defendant, as the trier of fact would have been free to discredit the self-serving portion, while at the same time believe the central feature of the confession that the defendant shot the victim during the course of an armed robbery that he had planned in advance. See *People v. Pecoraro*, 144 Ill. 2d 1, 11 (1991).

Accordingly, we find that the defendant has failed to establish the requisite showing of either prong of the *Strickland* standard. Therefore, the defendant's ineffective assistance of counsel claim must fail.

III. Erroneous Jury Instruction

Citing *People v. Ramey*, 151 Ill. 2d 498 (1992), the defendant next argues that his death sentence must be vacated and the cause remanded for a new sentencing hearing because the trial court failed to instruct the jury on the mental states necessary for a finding of death eligibility based on the felony-murder aggravating factor in section 9—1(b)(6) of the Criminal Code (720 ILCS 5/9—1(b)(6) (West 1996)). As previously noted, section 9—1(b)(6) provides that the State must prove that the

defendant acted with the intent to kill the murdered individual or with knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual. 720 ILCS 5/9—1(b)(6) (West 1996).

At the eligibility hearing, the jury was instructed as follows:

"Before the defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:

*First*: That the defendant was 18 years old or older at the time of the commission of the murder of which he was found guilty; and

*Second*: That one or more of the following aggravating factors exists:

The murdered person was killed in the course of another felony if the murdered person was actually killed by the defendant; and the other felony was armed robbery.

If you find from your consideration of all the evidence that the First and Second Propositions has [*sic*] been proved beyond a reasonable doubt, the defendant is eligible for a death sentence.

If you cannot unanimously find that both the First and Second Propositions have been proved beyond a reasonable doubt, the defendant is not eligible for a death sentence."

When comparing the instruction given by the court with the statutory language, it is clear that the court gave an incorrect instruction in this case. The correct instruction under the circumstances here is contained in Illinois Pattern Jury Instructions, Criminal, No. 7B.07(6) (3d ed. 1992), which provides in relevant part:

"Before the defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:

*First Proposition*: That the defendant was 18 years old or older at the time of the commission of the murder[s] of which he has been found guilty *** ; and

*Second Proposition*: That [(the following) (one or more of the following)] statutory aggravating factor[s] exist[s]:
***

■ The murdered person was killed in the course of another felony if

> [a] the murdered person was actually killed by the defendant; [and]
>
> ***
>
> [c] in performing the acts which caused the death of the murdered person, the defendant acted with the intent to kill the murdered person or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered person [or another];
>
> ***
>
> [e] the other felony [(was) (was one or more of the following:)] [(armed robbery) ***].
>
> * * *

If you find from your consideration of all the evidence that the First and Second Propositions have been proved beyond a reasonable doubt, then the defendant is eligible for a death sentence.

If you cannot unanimously find that both the First and Second Propositions have been proved beyond a reasonable doubt, then the defendant is not eligible for a death sentence."

We also note that, in addition to the above-mentioned defect in the jury instruction, the verdict form used at the eligibility phase of the defendant's sentencing hearing was a general verdict form that did not set forth the requisite mental state for the aggravating factor.

In *People v. Ramey*, 151 Ill. 2d 498 (1992), the jury instructions used for the felony-murder aggravating factor failed to mention the requirement that the defendant must have acted with knowledge or intent in causing the death of the victim. Moreover, the jury had returned a general verdict of murder at the conclusion of the guilt phase trial. Thus, the requisite finding had not been made by a trier of fact at any other stage of the proceeding. In reversing the defendant's death sentence and remanding for a new sentencing hearing, this court noted that a defendant can be found eligible for the death

penalty only if the jury unanimously finds that the State has proven beyond a reasonable doubt the existence of at least one of the eight aggravating factors. *Ramey*, 151 Ill. 2d at 544. In *Ramey*, this court distinguished *People v. Jones*, 81 Ill. 2d 1 (1979) (a case where a jury instruction omitted the requisite intent but it was found not to be reversible error), on the basis that the intent to kill was "blatantly evident" from the facts—the defendant shot the victim four times in the head and back and defense counsel admitted intent was "blatantly evident." *Ramey*, 151 Ill. 2d at 546.

Subsequent cases have distinguished *Ramey* in situations where the same jury that found the culpable mental states at the guilt phase after being properly instructed declared the defendant eligible for the death penalty. In those cases, the failure of the instructions to include the requisite elements at the eligibility stage was harmless. For example, in *People v. Armstrong*, this court found that the failure to give the proper jury instruction at sentencing tracking section 9—1(b)(6) did not rise to the level of plain error where the sentencing jury was properly instructed on the mental state at the guilt phase and the same jury returned a general verdict finding the defendant guilty of murder. *People v. Armstrong*, 183 Ill. 2d 130, 151-52 (1998) (court further observed that intent to kill victim was overwhelming where defendant beat victim with a cane, smashing her head in three pieces). Similarly in *People v. Childress*, this court distinguished *Ramey* and found that the failure to give the instruction on the mental state at the eligibility phase was harmless beyond a reasonable doubt where the verdicts from the guilt phase made it clear that the same jury had found that the defendant acted with knowledge or intent in causing the victim's death. *People v. Childress*, 158 Ill. 2d 275, 305-07 (1994); see also *People v. Casillas*, 195 Ill. 2d 461, 489-90 (2000) (no error occurred where jury was

properly instructed as to mental states at the guilt phase and returned a general verdict of guilty).

In response to the defendant's argument, the State argues that the defendant waived the issue of whether the jury instructions were proper by failing to object to the instructions at sentencing or to include the error in a motion to vacate the sentence. The State maintains that the issue should not be considered under the plain error doctrine because the evidence of the defendant's guilt was overwhelming and the defendant was not denied a fair sentencing hearing. Additionally, the State contends that any error was harmless because the defendant pled guilty to charges of intentional and knowing murder.

A defendant must object to alleged errors at trial and include the objection in a post-trial motion in order to preserve the issue for appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The waiver doctrine is not absolute, however, and Supreme Court Rule 615(a) (134 Ill. 2d R. ·615(a)) provides that we may review plain errors affecting substantial rights, though not objected to at trial or in a post-trial motion. *Armstrong*, 183 Ill. 2d at 151. In criminal cases, the plain error doctrine may be invoked where the evidence is closely balanced or the error was of such a magnitude that the accused was deprived of a substantial right and denied a fair sentencing hearing. *Armstrong*, 183 Ill. 2d at 151.

Here, we invoke the plain error doctrine to consider the issue because we find that the failure to give the instruction under the circumstances presented in this case deprived the defendant of a substantial right and denied him a fair sentencing hearing. See *People v. Simms*, 143 Ill. 2d 154, 170 (1991). The function of instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence. *People v. Williams*, 181 Ill. 2d 297, 318

(1998). Fundamental fairness requires the trial court to give correct instructions on the elements of the offense in order to insure a fair determination of a case by a jury. *Williams*, 181 Ill. 2d at 318.

While the right to a jury trial under the sixth amendment to the United States Constitution does not apply to sentencing, even in capital cases, Illinois law establishes a liberty interest, protected by the due process clause of the fourteenth amendment, in having a jury make particular findings relative to sentencing. See *People v. Mack*, 167 Ill. 2d 525, 534 (1995). Under Illinois law, if the prosecution seeks the death penalty, the defendant is entitled to have a jury decide whether the death penalty should be imposed. 720 ILCS 5/9—1(d) (West 1996). Moreover, during the eligibility phase of the sentencing hearing, the State must prove all of the elements of the aggravating factor beyond a reasonable doubt. 720 ILCS 5/9—1(f) (West 1996).

The jury instructions in the present case, just like those in *Ramey*, failed to mention that the defendant acted with knowledge or intent in causing the death of the victim. Also like *Ramey*, the required finding was not made by the jury at any other stage of the proceeding and the requisite mental states were not blatantly evident from the facts. The State's argument that the defendant's guilty pleas obviated the necessity for a jury finding as to the required elements must be rejected as contrary to the statute providing that the jury decide eligibility (720 ILCS 5/9—1(d), (f) (West 1996)). Moreover, we note that while the defendant's guilty pleas to intentional and knowing murder might be significant evidence of the defendant's eligibility, they are not conclusive proof and do not establish eligibility *per se*. In other words, the State was yoked anew with the burden of proving that the defendant acted with knowledge or intent in killing the victims. See *Mack*, 167 Ill. 2d at 534;

*Simms*, 143 Ill. 2d at 170-71; *Stewart*, 958 F.2d at 1387 (despite defendant's guilty pleas, State set out to prove at eligibility phase of sentencing defendant's intent to kill).

We acknowledge that defense counsel did not strenuously object to the defendant's death eligibility. At the same time, however, counsel did not concede that the defendant's intent to kill was "blatantly evident" from the facts. Thus, we do not, as the State suggests, find this case distinguishable from *Ramey*.

*People v. Mack*, 167 Ill. 2d 525 (1995), though not directly on point, is instructive here. In *Mack*, the defendant pled guilty to three counts of murder, which included intentional, knowing and felony murder. See *People v. Mack*, 105 Ill. 2d 103, 108-09 (1984). The State subsequently sought to prove the defendant death eligible based on the aggravating factor set forth in section 9—1(b)(6). The jury was properly instructed as to the aggravating factor, but the verdict form supplied to and returned by the jury in connection with the aggravating factor failed to specify that the defendant acted with the requisite mental state of intent or knowledge. On the State's appeal from the defendant's successful post-conviction petition, this court addressed the defendant's challenge to his death sentence on the basis that the jury's verdict did not specify that the defendant acted with the requisite mental state.

In affirming the reversal of the defendant's death sentence, this court held that "where the verdict purports to set out the elements of the offense as specific findings, it must do so completely or be held insufficient." *Mack*, 167 Ill. 2d at 538. Despite the defendant's guilty pleas and the significant evidence in the record that the defendant intentionally killed the victim, this court rejected the State's argument that the defect in the verdict was cured by the correct jury instructions on the

requisite mental state requirements which were additionally emphasized by the prosecutor during closing argument. *Mack*, 167 Ill. 2d at 535-36.

In the instant case, the jury instructions as well as the verdict form failed to set forth the requisite mental state for the aggravating factor as listed in section 9—1(b)(6). Thus, the error in the present case is arguably even more egregious and prejudicial than the one in *Mack*. While the *Mack* court noted that the same type of general verdict form used in the present case is appropriately used when only one statutory aggravating factor is at issue (*Mack*, 167 Ill. 2d at 538), we believe that the use of the general verdict form presumes a correct instruction will be given especially when the trier of fact has not found the requisite mental state at any other stage in the proceeding. *Simms*, 143 Ill. 2d at 170-71 (jury's return of a general verdict of eligibility does not cure error in the instructions).

For the reasons stated above, we conclude that the defendant's sentence of death must be vacated and the cause remanded for a new sentencing hearing with correct instructions. Consequently, we will address only those additional contentions raised by the defendant which are likely to be a factor on remand.

### IV. Multiple Convictions

The defendant argues that his convictions for knowing and felony murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1996)) must be merged into the single most culpable murder count, intentional murder (720 ILCS 5/9—1(a)(1) (West 1996)). The State confesses error, and we agree. If only one person has been murdered, there can be but one conviction for murder; only the conviction for the most culpable charge will be upheld, while the other less culpable murder charges must be vacated. *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001). An intentional murder involves a more culpable mental state than

knowing or felony murder. *Mack*, 105 Ill. 2d at 137. Accordingly, we vacate the defendant's convictions for knowing and felony murder.

V. Improper Evidence Presented at Sentencing

The defendant next argues that testimony from the victim's fiancée about her relationship with the victim was irrelevant to any issue at the eligibility phase and denied the defendant a fair hearing, citing *People v. Brisbon*, 106 Ill. 2d 342 (1985), and *People v. Ramirez*, 98 Ill. 2d 439 (1983). The defendant further argues that his eighth amendment right to a fair sentencing hearing was violated when the trial court allowed evidence from the victim's family members that they believed the death penalty should be imposed in this case. *People v. Towns*, 174 Ill. 2d 453 (1996). The defendant acknowledges that he waived both of the issues by failing to object at the respective phases of the sentencing hearing; however, he argues that the matters should be considered on appeal because they amounted to plain error and his counsel was ineffective for failing to object.

In response, the State essentially concedes that the admission of the complained-of evidence was error but argues that it was harmless. Given the State's acknowledgment that these matters amounted to error, we do not believe that they are likely to recur on remand and therefore we will not address them further here.

VI. Constitutionality of Death Penalty Statute

In light of our decision to vacate the defendant's capital sentence and remand for a new sentencing hearing, we need not address the two issues that the defendant raises as to the constitutionality of the death penalty statute. *People v. Shaw*, 186 Ill. 2d 301, 358 (1998).

CONCLUSION

For the reasons stated, we vacate the defendant's

convictions for felony murder and knowing murder. The defendant's remaining convictions are affirmed. We also vacate the defendant's death sentence and remand the cause to the circuit court for a new sentencing hearing pursuant to section 9—1 of the Criminal Code (720 ILCS 5/9—1 (West 1996)).

*Convictions affirmed in part and vacated in part;*
*death sentence vacated;*
*cause remanded.*

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that we should vacate Fuller's convictions for felony murder and knowing murder. In my view, however, we should also set aside his remaining convictions and grant him the opportunity to be tried in accordance with the new rules promulgated by our court for the conduct of cases in which the State is seeking the death penalty. Adherence to those rules is indispensable for achieving an accurate determination of innocence or guilt, and the rules apply to all capital cases now coming before us on review, including cases commenced before they were enacted. *People v. Hickey*, 204 Ill. 2d 585, 635 (2001) (Harrison, C.J., dissenting); see also *People ex rel. Birkett v. Bakalis*, 196 Ill. 2d 510, 513 (2001).

Even if Fuller were not entitled to a new trial, I would regard the majority's disposition as inadequate. In remanding for resentencing, this court should bar the State from seeking the death penalty. As set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent a new trial conducted in accordance with the new rules, there is no basis for altering that conclusion.

JUSTICE KILBRIDE, also concurring in part and dissenting in part:

I concur in part with the judgment to vacate Fuller's convictions for felony murder and knowing murder. Nevertheless, I agree with Chief Justice Harrison that defendant's remaining convictions and sentence should also be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. Consequently, the rules, promulgated to help remedy the flaws of the old system, must be applied retroactively to all capital cases currently pending on direct appeal. See *People v. Hudson*, 195 Ill. 2d 117, 126 (2001); see also *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For this reason, defendant should receive a new trial in compliance with the new rules.