2020 IL App (1st) 170566-U

SIXTH DIVISION
April 17, 2020

No. 1-17-0566

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 81 CR 5087 (03) |
| | ) | |
| RICHARD HODGES, | ) | |
| | ) | Honorable Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Justices Cunningham and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:*    Circuit court's conclusion that trial counsel was not ineffective for failing to interview and call two witnesses to testify was not manifestly erroneous; affirmed.

¶ 2    Defendant, Richard Hodges, appeals the circuit court's dismissal of his postconviction petition after an evidentiary hearing. Defendant contends that his petition should have been granted because his trial counsel was ineffective for failing to interview and call two witnesses to testify about certain ballistics evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      We previously recounted the background of this case in *People v. Hodges*, 2014 IL App (1st) 122313-U. Around 1 a.m. on January 20, 2001, defendant participated in a shooting incident in the vicinity of a gas station near Augusta Boulevard and Cicero Avenue in Chicago. The victim, Christopher Pitts, died as a result. Following a 2003 jury trial, defendant was found guilty of first degree murder, aggravated discharge of a firearm, and unlawful use of a weapon by a felon. Defendant was sentenced to 60 years in prison for murder, which included a 20-year enhancement because defendant personally discharged a firearm. Consecutive to the murder sentence, defendant was sentenced to concurrent 10 and 5-year prison terms for aggravated discharge of a firearm and unlawful use of a weapon by a felon. Defendant's codefendants and nephews, Toniac Jackson and David Jackson, were tried simultaneously in severed bench trials. The evidence at trial showed that defendant fired shots in Pitts's direction with a 9-millimeter gun and Toniac fired a 10-millimeter gun at Pitts. A third gun, which was a .25 caliber, was recovered by police and apparently belonged to David. The State's theory at trial was that defendant was guilty of first degree murder under an accountability theory. Meanwhile, defendant contended that Pitts and his friends shot at him, and so his actions amounted to second degree murder or self-defense.

¶ 5                                    A. Defendant's Trial

¶ 6      Before trial, the State indicated that Detective Edward Cunningham could be one of its witnesses. Forensic Investigator Chester Garelli was listed as a witness for defendant, along with anyone listed in the State's answer to discovery.

¶ 7      James Wilson testified at trial that at around 12:30 or 1 a.m. on January 20, 2001, he was in a van with Pitts, the eventual victim, and others at a gas station located at Augusta and Cicero. While Wilson, Pitts, and another member of their group were buying water, a man who was not

with Wilson's group threw a bottle at Pitts, who ran north. Wilson initially stated that the man who threw the bottle only took a few steps, but admitted that he told an assistant State's Attorney that this man shot at Pitts. Wilson further stated that a second man at the gas station, who he told an assistant State's Attorney was defendant, chased and shot at Pitts. The van drove off and he ran down a side street. When Wilson returned to Augusta and Cicero, he saw that Pitts was dead. Wilson denied that anyone in the van had a gun or that any shooting came from the van. Wilson also stated that he could not tell who was firing guns during the incident.

¶ 8     At one point during the trial, the court advised the parties that it had located a letter from Kris Rastrelli from the Illinois State Police about a discrepancy with respect to evidence submitted by the police department. The letter appeared to be a response to a subpoena by counsel for one of the codefendants. Referencing different documents, defense counsel stated, "One of the problems is that the author of this report or one of the letters is Detective Cunningham[,] which the State is trying to help us locate, we're hoping to work out possibly a stip[ulation] but if Cunningham then becomes important on this case if he weren't before he might be important now. Hopefully we'll find him still but that remains an issue."

¶ 9     Returning to testimony, Robert Tovar, a forensic investigator with the Chicago Police Department, testified that when he arrived at the scene, he met with detectives Cunningham and Andras.[1] Tovar observed and recovered metal fragments, fired bullets, and cartridge casings. A van with bullet holes was parked near Pitts's body and had a fired bullet in the front passenger seat. There was also a bullet in the wall of a nearby apartment building and a bullet in Pitts's clothing. Tovar recovered approximately seven cartridge casings around Pitts's body, all 9-millimeters, and 9-millimeter, 10-millimeter, and .25 caliber cartridge casings from the area

---

[1] Detective Andras's name is also spelled "Andres" in the record. We use the spelling from the State's amended answer to discovery and our previous order.

around the gas station. In total, eleven 9-millimeter, five 10-millimeter, and eight .25-caliber shells were recovered.

¶ 10    On cross-examination, Tovar stated that detectives Cunningham and Andras were also at the scene part of the time, directing what they wanted done, but Tovar and his partner assisted each other in collecting the evidence. Certain areas had been taped off before Tovar had arrived. Tovar estimated that he spent at least a couple of hours on the scene. Defense counsel asked whether any shell casings could be recovered from a revolver. At first, Tovar stated that he had collected cartridge casings from revolvers at crime scenes, but confirmed that normally, the shell casing stays in a revolver after a bullet is fired.

¶ 11    Kris Rastrelli, a forensic scientist for the Illinois State Police who specialized in the area of firearms and tool mark identification, testified that the 9-millimeter cartridge casings that were recovered were fired from the same firearm, as were the 10-millimeter cartridge casings that were recovered. The recovered .25-caliber cartridge casings were fired from the .25-caliber handgun that was recovered. Other bullets and fragments that were recovered were 9-millimeter/.38 caliber. On cross-examination, Rastrelli stated that the 9-millimeter shell casings had two different head stamps, which consist of the name of the manufacturer and cartridge. Further, Rastrelli could not identify the caliber from one fired bullet jacket fragment and one metal fragment and two parent bullet cores were unsuitable for further microscopic comparisons. Rastrelli acknowledged that as of approximately 13 months after the shooting, she had not yet received the bullets to examine. Rastrelli would not say that a delay of that length was common, but "it's not uncommon."

¶ 12    Dr. Tae An, a deputy medical examiner who performed Pitts's autopsy, testified that Pitts had six entry wounds and six exit wounds. Pitts died of multiple gunshot wounds and the manner

of death was homicide. All of the wounds were back to front, but two were directed toward Pitts's left side.

¶ 13    Assistant State's Attorney Scott Herbert (Herbert) testified about the statement defendant made to law enforcement about the incident. With Detective Cunningham present, Herbert spoke to defendant twice over the course of several hours. Defendant admitted to shooting Pitts during the second conversation, but did not want to memorialize a statement. Later, defendant stated he wanted to make a videotaped statement, whereupon defendant and Herbert had another conversation in which defendant admitted his involvement. A videographer was then summoned.

¶ 14    In the videotaped statement, defendant recalled that on January 20, he was in a Tracker with Toniac and David. Defendant had a 9-millimeter handgun, but he did not know if Toniac and David also had weapons. After the three men arrived at the gas station, Toniac went to a cashier window to buy some juice. As Toniac waited in line, Pitts and other men arrived in a van. Pitts and Toniac began arguing and Toniac tried to hit Pitts with a bottle. After the door to the van opened and another man began to get out, defendant fired two shots over the men's heads, and Toniac and the other men began to run. Toniac and defendant both fired shots and chased Pitts. When defendant reached the middle of the street, he ran out of bullets, but kept chasing Pitts. At one point, Pitts fell over, which defendant assumed was because Pitts had been shot. Eventually, defendant ran back to the Tracker, but changed course when he noticed it was being followed by a squad car. As defendant ran, he dismantled his gun and threw various pieces into alleys to prevent anyone else from getting a hold of it. While the shooting was occurring, defendant did not see anyone besides himself and Toniac with a weapon.

¶ 15    On cross-examination, Herbert acknowledged that he and defendant had a number of conversations before the videotape was made. Herbert did not recall what defendant told detectives

before Herbert arrived, whether police reports indicated that defendant made remarks about matters that were not discussed on the videotape, or if everything Herbert and defendant had previously discussed was discussed again on the videotape.

¶ 16    After the State's case, defense counsel indicated his witnesses would be defendant and someone who would testify about defendant's reputation for peacefulness. Defense counsel added that "we will likely rest at that point," but "we are still talking about that one witness as you know."

¶ 17    Defendant testified that he fired shots at the gas station because the group from the van was "fixing to do something" and he wanted to protect himself and Toniac. Defendant was afraid of the group in the van because they were "known in the neighborhood for doing a lot of different stuff," such as carjackings and carrying guns. Defendant denied that he fired in anyone's direction and thought that his shots would prompt the group to disappear and leave Toniac alone. After defendant fired the shots, the group ran around the gas station. Defendant also heard a few shots, including one that went past his head, but he did not see any guns. Defendant, Toniac, and Pitts ran off. When defendant turned a corner, he saw that the door to the van was open and "it was like a burst *** of fire came out of the van." Defendant shot at Pitts, who was in front of him, because he thought Pitts was shooting at him. According to defendant, a lot of shots were being fired. Eventually, defendant ran out of bullets and ran to the middle of the street, where he saw a squad car and heard three or four more shots. Defendant ran away from the squad car and threw away pieces of his gun before he ultimately returned to his home.

¶ 18    Defendant also testified about the circumstances of his videotaped statement. Defendant agreed to do the videotaped statement because he wanted to "tell them the truth." Defendant acknowledged that on the videotape, he had stated that he did not see guns, but maintained that he had told Herbert at some point that he heard bullets and saw gunfire. Defendant did not say that

on the tape because Herbert "didn't ask me that question" and had told defendant to "just answer yes or no." Defendant added that his intention on the night of the incident was to protect himself and his nephew.

¶ 19    On cross-examination, defendant admitted that when he went to the gas station, he had a 9-millimeter handgun, Toniac had a 10-millimeter handgun, and David had a .25-caliber handgun. Defendant also acknowledged that he never saw Pitts fire a shot and never saw a gun in Pitts's hand.

¶ 20    Defendant's former employer, Tim Dolgach, testified that other people at his company spoke of defendant as easy and enjoyable to work with.

¶ 21    Before the defense rested, and during a discussion in chambers, defense counsel stated that Detective Cunningham and Officer Andras had been subpoenaed, but would not be called as witnesses. Defense counsel also stated, "There has been continuing attempts at contact with Officer Cunningham who is in rehab. We have spoken to the Defendant and advised him of the circumstances and which route he would like us to take."

¶ 22    In closing argument, the State emphasized that Pitts was unarmed and noted that no weapon was recovered from him. Further, defendant admitted that he committed murder where he admitted that he chased and fired a gun at Pitts and did not see Pitts with a gun or see him fire any shots.

¶ 23    Defense counsel contended in closing that there were other guns involved in the incident, noting the different head stamps on the 9-millimeter shells. Defense counsel asserted that collecting evidence from the scene "was a bungled operation." Investigators did not return to the scene in the morning, when it was light out, to see what other evidence could be found. Defense counsel stated that during his in-court testimony, Investigator Tovar, who "was the man who [at] 2:00 o'clock in the morning is charged with gathering up evidence," "could hardly see the

evidence" and took his glasses off. Rastrelli's testimony also indicated that the investigation was "largely bungled," based on the delay in receiving evidence. Turning to defendant's statement, defense counsel asserted that defendant volunteered his story because he believed his conduct was justified. Assistant State's Attorney Herbert did not remember if the full story that defendant gave during previous interviews was the same version that appeared on the videotape. Defendant "needed to take the stand" at trial "to tell you the story."

¶ 24    In rebuttal, the State challenged the suggestion that other guns were involved and maintained that the only shells found at the scene were from the guns belonging to defendant and his nephews. The State also emphasized that Pitts was shot six times in the back and did not have a gun. Further, defendant did not see Pitts with a gun.

¶ 25    Following closing arguments, the court instructed the jury and included instructions for second degree murder and self-defense. The jury found defendant guilty of first degree murder, aggravated discharge of a firearm, and unlawful use of a weapon by a felon. Defendant was sentenced to 60 years in prison for murder, which included a 20-year enhancement because defendant personally discharged a firearm. Consecutive to the murder sentence, defendant was sentenced to concurrent 10 and 5-year prison terms for aggravated discharge of a firearm and unlawful use of a weapon by a felon.

¶ 26                                  B. Direct Appeal

¶ 27    On direct appeal, defendant contended that: (1) the State failed to prove beyond a reasonable doubt that he was guilty of aggravated discharge of a firearm; (2) the trial court should not have allowed the State to publish Wilson's statement as substantive evidence; and (3) the statute mandating the addition of 20 years to his murder sentence was unconstitutional. On April 22, 2005, this court affirmed defendant's convictions and sentence. *People v. Jackson*, Nos. 1-03-

2233, 1-03-3099 & 1-03-3216 (cons.) (2005) (unpublished order under Supreme Court Rule 23), *appeal denied*, No. 100659 (Dec. 1, 2005).

¶ 28                         C. Postconviction Proceedings

¶ 29                           1. First Stage Proceedings

¶ 30    On January 12, 2006, defendant filed a *pro se* postconviction petition that alleged in part that he had received ineffective assistance of counsel at trial. Defendant contended that his counsel failed to recite and introduce evidence of additional shooters. According to defendant, counsel had boasted to defendant about "particular crime scene reports" that defendant saw and that showed members of Pitts's group were firing handguns. Defendant alleged that the reports were signed by Detective Cunningham and indicated that he had retrieved 9-millimeter, 10-millimeter, .22-caliber, .25-caliber, and .45-caliber casings, many of which were not submitted as evidence at defendant's trial. Defendant contended that the reports would have shown that Pitts and his group were shooting handguns and would have supported defendant's claim of self-defense. Defendant further alleged that his counsel went on with the trial even though he had not received the evidence on another set of shell casings that were 9-millimeter, .22-caliber, and .45-caliber. Also, defendant stated that more than 45 to 50 spent shell casings were recovered from the scene, but only 22 were presented at trial. Defendant discussed his attempts to include more support for his claim that there were additional shell casings. In an attached request for a court order, defendant stated that a document from the medical examiner's office indicated that more shell casings were recovered from the scene than were presented at trial, and these additional shell casings were 9-millimeter, .45-caliber, and .22-caliber. Eventually, defendant spoke to an employee at the medical examiner's office who stated that the document in question was a crime scene progress report signed by Detective Cunningham.

¶ 31    Defendant also alleged that his counsel should have called Detective Cunningham to testify. According to defendant, Detective Cunningham would have testified about the other set of shell casings that came from Pitts and his group, which defendant alleged were 9-millimeter, .22-caliber, and .45-caliber. Defendant averred that his counsel "knew how extremely critical this officer was" to his trial, but did not ask for a continuance or mistrial when counsel had trouble locating him. Defendant also alleged that his counsel lied when he told the court that defendant was consulted about whether to call as witnesses Detective Cunningham and Detective Andras.

¶ 32    In an affidavit, defendant recalled a conversation he had with his counsel in 2004 about Detective Cunningham and Detective Andras. Counsel told defendant that defendant had a mistrial because neither detective had testified, but counsel had not asked for a mistrial "because he felt lucky." Defendant further averred that because the detectives were key to his defense, he never would have agreed to not have them testify.

¶ 33    Defendant's *pro se* petition included other claims, but they are not part of this appeal.

¶ 34    On February 21, 2006, the circuit court summarily dismissed defendant's petition as frivolous and patently without merit. The appellate court affirmed the summary dismissal (*People v. Hodges*, No. 1-06-0902 (2008) (unpublished under Supreme Court Rule 23)), but our supreme court reversed and remanded the petition for second-stage proceedings (*People v. Hodges*, 234 Ill. 2d 1 (2009)).

¶ 35                              2. Second Stage Proceedings

¶ 36    On remand, postconviction counsel was appointed, who filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) and prepared an amended petition that incorporated the *pro se* petition and contained other claims, including that trial counsel was ineffective for failing to sufficiently demand explanations for inconsistencies and discrepancies,

or document the sloppy manner in which the recovered ballistics evidence was handled. Among the items attached to the petition was a report from the Cook County medical examiner's office that stated:

"In summary, the subject an eighteen year old male was standing outside a vehicle parked in a gas station talking to another male, when reportedly three offenders walked up with hand weapons, and fired shots at the subject. The subject ran southbound on Cicero Avenue, and was being pursued by the offenders, who were shooting at the subject as he was running.

Reportedly the subject was struck multiple times, and fell on the street at the above location of occurrence. Police advise that two of the offenders are in custody, and numerous shell casings were found at the scene, consisting of .22 [caliber], 9 mm, and .45 [caliber] type ammunition. This case was ordered into the Forensic Institute."

Detective Cunningham was listed as the person interviewed for the report and the reporting investigator was Chester Garelli. Below, we refer to this document as the Garelli report.

¶ 37    Also attached to the amended petition was a report that described evidence received by the Illinois State Police Forensic Science Center, which consisted of various bullets, fragments, and 9-millimeter, 10-millimeter, and .25-caliber cartridge casings. Defendant also attached a discrepancy notification from Kris Rastrelli from the Illinois State Police, indicating that although the inventory stated that five 10-millimeter cartridge casings were submitted, "only four [unreadable] of 10 mm caliber were inside the envelope."

¶ 38    The State filed a motion to dismiss the petition, which the circuit court granted on July 18, 2012. After defendant appealed, this court remanded for an evidentiary hearing on two of

defendant's claims: his counsel was ineffective for failing to investigate and present evidence of additional bullet casings and his counsel was ineffective for failing to interview a witness named Michael Glasper. *People v. Hodges*, 2014 IL App (1st) 122313-U. In part, this court stated that "questions remain about defense counsel's investigation and failure to present evidence of additional casings." *Id*. ¶ 78. This court affirmed the dismissal of defendant's other claims. Defendant's petition for leave to appeal to the Illinois Supreme Court was denied on March 25, 2015. Only the bullet casings claim is at issue in this appeal.

¶ 39                           3. Third Stage Evidentiary Hearing

¶ 40    At the evidentiary hearing, defendant's trial counsel, Marvin Leavitt, testified that his theory of the case was self-defense, defense of others, and that the State would be unable to prove guilt beyond a reasonable doubt. Leavitt recalled that defendant's statement was the most damaging piece of evidence, as the statement alone could lead to a conviction. Other than "the knocking-out of that statement," the Garelli report was another avenue of defense that Leavitt considered. Leavitt had the Garelli report before trial and knew that the information in that report was not consistent with information in police reports. As further support for the caliber of the casings noted in the Garelli report, Leavitt referred to Rastrelli's testimony that she could not identify the caliber of certain fragments or shell casings. Yet, Leavitt did not specifically know of .22- and .45-caliber bullets and when he examined the shells before trial, he did not see any that were of those calibers. He hoped to support the argument that defendant was fired at based on the available evidence. To that end, Leavitt fashioned an argument based on the different head stamps on casings of the same caliber, the fragments whose caliber Rastrelli could not identify, and defendant's testimony that he was shot at. Leavitt also noted at trial that other types of weapons,

such as revolvers, do not involve shells. Leavitt relied on the arguments he presented because he did not believe there had been spoliation of evidence or a conspiracy to get rid of shells.

¶ 41   Leavitt further recalled that initially, he wanted Detective Cunningham to testify because in the Garelli report, it was Detective Cunningham who stated that there were .22- and .45-caliber shell casings, though Leavitt noted that none were received in evidence. On the day of trial, Leavitt learned that Detective Cunningham was also on the State's witness list, and the State tried to locate him. Leavitt ultimately decided not to call Detective Cunningham for several reasons. Leavitt's focus "was really on the statement" and Leavitt had not seen .22- or .45-caliber shells in the evidence he received. Moreover, at no point in his investigation did Leavitt have any information to support the existence of 45 to 50 shell casings at the scene when the police first arrived. Leavitt thought he "had enough with Rastrelli that the shells weren't going to be a big issue." Further, Detective Cunningham was not the officer who recovered the shells. Rather, "[i]t was either [Andras] or Tovar who I believed *** had recovered the shells, so I didn't think that it would be of value to set up a strawman to knock him down." Detective Cunningham's whereabouts posed challenges as well. At the time of trial, Detective Cunningham was receiving rehabilitation services. Leavitt was not sure he could count on Detective Cunningham's credibility. Also, as a police officer, "all he has to come and say is no, those are all the shells and Tovar collected them." Without police conspiracy, negligence, or spoliation of evidence, Leavitt did not see a use for Detective Cunningham that could not be overcome with the evidence he had. Leavitt thought he could make the necessary arguments "from fragments and revolvers" and he was not "locked into an officer who wasn't available." Leavitt maintained that he was truthful when he informed the trial court that he and defendant had discussed the decision to not have Detective Cunningham

testify. Leavitt denied telling defendant that he could have had a mistrial because detectives Cunningham and Andras did not testify, but he did not ask for one because he felt lucky.

¶ 42    Asked whether he would have called Detective Cunningham if he had not been receiving rehabilitation services, Leavitt responded:

"I was thinking to call Cunningham. I would have waited. Certainly, the State was going to go first.

We talked about whether or not we were going to ask for a continuance because Cunningham was impaired. I decided not to ask for a continuance, so the answer I think is no. I was ready to go to trial on the theories I had in place."

Leavitt would have asked for a continuance if he had thought on the day of trial that Cunningham would offer something that might change the result. Overall, "[t]he strategy came into place as we were moving into the trial."

¶ 43    As for calling Investigator Garelli to testify at trial, Leavitt noted that he was not sure how to admit Garelli's testimony because he would have been a hearsay witness. Still, Garelli was on the defense's witness list. Leavitt considered calling him, but decided that "I had my argument in place. Whether good or bad, that was going to be my argument."

¶ 44    Another witness at the evidentiary hearing was Detective Cunningham, who recalled that he was one of the detectives on defendant's case. Although his responsibilities included talking to the medical examiner's office, he did not recall talking to Garelli about this case or telling Garelli that his investigation revealed that .22- and .45-caliber ammunition was used in the shootings. Detective Cunningham believed that the person he spoke to at the medical examiner's office was Investigator Rios. Detective Cunningham discussed general communication procedures between the police and the medical examiner's office. For a homicide case, investigating detectives would

contact an investigator from the medical examiner's office and provide a brief synopsis of the situation. However, it was not standard practice to relay the caliber of firearms evidence that was recovered at the crime scene. Detective Cunningham would not review for accuracy a report that was written by someone at the medical examiner's office. Also, it was the responsibility of mobile crime lab personnel to collect evidence and it was not usually detectives' responsibility to recover shell casings. Detective Cunningham recalled that he went on medical leave before the trial started. He did not recall the specific date his leave started or exactly how long his leave lasted.

¶ 45    After the hearing, the court concluded that defendant failed to show the denial of a constitutional right by a preponderance of the evidence. Noting Leavitt's credibility, the court found that defense counsel was not deficient for failing to investigate and present ballistics evidence in support of a self-defense theory. Nothing in Leavitt's investigation revealed that 45 to 50 shell casings were recovered at the scene and there was no evidence supporting defendant's claim that there were that many shell casings recovered. The only notation of .22- and .45-caliber shell casings was in the Garelli report, but Leavitt decided not to call Detective Cunningham as a matter of trial strategy. Leavitt already had theories in place and concluded that Detective Cunningham's testimony would not be useful. The court found that Leavitt's failure to call Detective Cunningham or introduce additional ballistics was not so irrational that it fell below an objective standard of reasonableness. The court further stated that even if counsel's performance was deficient, defendant did not show prejudice. In his statement, which was the most damaging piece of evidence, defendant admitted to shooting in the direction of a person who was running away and who defendant never saw fire a gun. Further, the jury convicted defendant in spite of evidence that several shell casings could not be identified and there were different head stamps on shell casings of the same caliber—evidence that supported the self-defense/defense of others

theory. The court found that the ballistics evidence that defendant claimed his counsel should have investigated and introduced at trial would not have changed the outcome. Defendant's postconviction petition was dismissed.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, defendant contends that his trial counsel was ineffective for failing to investigate and present the testimony of Detective Cunningham and Garelli. Defendant argues that trial counsel's excuses for not calling Detective Cunningham and Garelli to testify were incredible or unpersuasive. Defendant also asserts that not calling them to testify was prejudicial because their testimony would have bolstered defendant's testimony, attacked the State's theory, and further undermined confidence in the police investigation.

¶ 48    The Post-Conviction Hearing Act (Act) allows people convicted of criminal offenses to challenge their convictions based on constitutional violations. 725 ILCS 5/122-1 *et seq.* (West 2010). The Act provides for three stages of review. At the first stage, the circuit court may dismiss a postconviction petition that is "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). If the circuit court does not dismiss the petition, the petition advances to the second stage, where counsel may be appointed and the State may file an answer or motion to dismiss the petition. 725 ILCS 5/122-4, 122-5 (West 2010). At the second stage, the circuit court must determine whether the petition and any documentation make a " 'substantial showing of a constitutional violation.' " *People v. Domagala*, 2013 IL 113688, ¶ 33. If that showing is made, the defendant is entitled to a third stage evidentiary hearing. *Id*. ¶ 34. There, the circuit court acts as the fact finder, and determines witness credibility, decides the weight to be given testimony and evidence, and resolves any evidentiary conflicts. *Id*. "After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed

unless it is manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Our review is *de novo* if no new evidence is presented and the issues presented are pure questions of law, unless there are certain other circumstances. *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). The evidentiary hearing that was held here falls into the former category because it involved fact finding and credibility determinations, and so we review the circuit court's decision for manifest error.

¶ 49    To succeed on a claim for ineffective assistance of counsel, a defendant must show: 1) his counsel's performance was deficient, and 2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 50    Turning to defendant's claim, defendant asserts that Detective Cunningham's testimony would have helped whether he confirmed or denied the Garelli report. Defendant further argues that several of counsel's proffered reasons for forgoing Detective Cunningham's testimony were known to counsel before trial, and so could not justify forgoing his testimony during trial. Moreover, any credibility issues stemming from Detective Cunningham receiving rehabilitation services would have undermined confidence in the investigation.

¶ 51    Defendant also states that Garelli could have testified about the contents of his report, which indicated that per Detective Cunningham, the crime scene contained .22- and .45-caliber shell casings. No trial testimony mentioned shell casings of those calibers. Defendant argues that by calling Garelli, counsel could have revealed a clash of testimony, highlighted evidence discrepancies, and further discredited the investigation. Further, Garelli could have corroborated defendant's account and supported counsel's argument that there was a gun battle. Defendant

acknowledges that Garelli would have been a hearsay witness, but maintains that the information in the Garelli report could have been offered for reasons other than its truth. Defendant further asserts that the report also could have been offered for its truth as part of defendant's constitutional right to a meaningful criminal defense.

¶ 52 Generally, counsel's decision whether to present a particular witness is a strategic choice that cannot support an ineffective assistance claim. *People v. Richardson*, 189 Ill. 2d 401, 414 (2000). Although strategic decisions may be deemed ineffective when they result in a failure to present exculpatory evidence of which counsel is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense (*People v. King*, 316 Ill. App. 3d 901, 913 (2000)), that did not occur here. We see no reason to disturb the circuit court's finding that trial counsel's performance was not deficient. Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*.

¶ 53 Defendant would have offered Detective Cunningham's and Garelli's testimony to discredit the police's investigation and support defendant's theory that he was being shot at by members of Pitts's group. Trial counsel executed that avenue of defense through different means. At the evidentiary hearing, Leavitt testified that he was aware of the Garelli report and its importance. However, Leavitt did not see any .22- or .45-caliber shell casings when he examined the shells before trial. With Detective Cunningham unavailable to testify, Leavitt decided to focus on other evidence and arguments at his disposal: Rastrelli's testimony about the different head

stamps and fragments that could not be identified, that other types of weapons do not involve shells, and the amount of time it took for Rastrelli to receive the ballistics evidence. Leavitt also stated that he wanted to "[knock]-out" defendant's statement, which he recognized as damaging. Leavitt attempted to elicit testimony from the assistant State's Attorney who took defendant's statement that defendant had raised matters not discussed in the videotaped statement and elicited testimony from defendant that he told the assistant State's Attorney that he heard bullets and saw gunfire. During trial, Leavitt found himself at a fork in the road—ask for a continuance so that Detective Cunningham could testify, which came with potential drawbacks, or work with the evidence and arguments he had. Leavitt chose the latter course. A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or judgment do not, by themselves, render the representation incompetent. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). That another attorney might have pursued a different strategy, or that the strategy chosen by counsel proved unsuccessful, does not establish ineffective assistance of counsel. *Id*. The decision not to call Cunningham to testify can be justified as sound trial strategy and the circuit court's conclusion that counsel was not ineffective on this basis is not manifestly erroneous.

¶ 54    Further, Leavitt's decision not to call Garelli to testify was reasonable, based on the potential difficulty that Leavitt identified. Although Garelli was on the witness list, Leavitt was unsure how to overcome his status as a hearsay witness. An argument could be made that by offering Garelli's testimony to highlight a discrepancy, the testimony would not be hearsay. See *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 193 (where witness A testifies that "B told me that event X occurred," and A's testimony is offered to establish that B said this, A's testimony is not hearsay). Defendant argues that the hearsay testimony would have been admitted as a constitutional matter, which we note is reserved for situations where a crucial part of the

defendant's case would otherwise be excluded and the defendant had an insufficient opportunity to respond to the State's accusations. See *People v. Manion*, 67 Ill. 2d 564, 577 (1977). Even if Garelli's testimony would have been admitted, defendant's argument verges on the kind of second-guessing that *Strickland* prohibits. See *Strickland*, 466 U.S. at 689 (fair assessment of performance "requires that every effort be made to eliminate the distorting effects if hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"). Leavitt testified that he had other evidence to support defendant's theory. In light of Garelli's potential status as a hearsay witness, and the availability of other ballistics evidence, Leavitt's decision not to call Garelli did not fall "below an objective standard of reasonableness." *People v. Palmer*, 162 Ill. 2d 465, 475 (1994).

¶ 55     Defendant makes a separate argument that Leavitt was ineffective for not interviewing Detective Cunningham and Garelli. Whether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented. *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005). The circuit court did not make a finding about Detective Cunningham's credibility at the evidentiary hearing, where he discussed an investigation that occurred many years earlier. Garelli did not testify at the evidentiary hearing. We do not know the full details of what would have been learned from interviewing Detective Cunningham and Garelli. However, the circuit court determined that defendant was not prejudiced by the failure to investigate and introduce the additional ballistics evidence, and we agree. To establish prejudice, a defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. The prejudice analysis is "more

than an 'outcome-determinative' test." *Richardson*, 189 Ill. 2d at 411. A defendant must show that counsel's deficient performance made the result of the trial unreliable or the proceeding fundamentally unfair. *Id.*

¶ 56    As the circuit court noted, in his statement that was admitted at trial, defendant stated that he fired shots at Pitts, who defendant did not see with a weapon and was running away from defendant. Further, the jury convicted defendant despite being presented with evidence that there were other shooters, including that certain ballistics-related items could not be identified and there were different head stamps on shell casings of the same caliber. We acknowledge that in our order addressing defendant's second stage proceedings, we noted the potential importance of additional ballistics evidence. However, a different standard of review applies after an evidentiary hearing than at second stage proceedings. Below, the circuit court served as the fact finder and determined witness credibility, decided the weight to give to testimony and evidence, and resolved any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34. The court's conclusion that the additional ballistics evidence would not change the trial outcome, and so defendant was not prejudiced, is supported by the evidence and not manifestly erroneous. Defendant's postconviction petition was properly dismissed.

¶ 57                                  III. CONCLUSION

¶ 58    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 59    Affirmed.