NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170781-UNO. 4-17-0781

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 29, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| KEVIN D. DECKARD, | ) | No. 16CF327 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brien J. O'Brien, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant failed to demonstrate counsel was ineffective when she failed to move to strike the victim's testimony that defendant sexually assaulted five other people and elicited the identity of those five other people.

(2) Defendant failed to demonstrate counsel was ineffective for failing to object to inadmissible hearsay statements.

(3) The State's evidence was sufficient to support its allegation that defendant committed predatory criminal sexual assault of a child when he placed the victim's foot against his sex organ for the purpose of his sexual gratification or arousal.

(4) The conduct for which defendant was accused and convicted in counts IV through VI satisfy the elements of a lesser offense, and thus his life sentences imposed on those three counts violate the proportionate penalties clause.

¶ 2    In July 2017, the trial court conducted a jury trial on the State's seven counts of predatory criminal sexual assault of a child filed against defendant. The State presented evidence that defendant had repeatedly sexually abused his girlfriend's granddaughter. Included in the State's evidence was the testimony of the victim and defendant's adult daughter, who had also

been sexually abused by defendant during her youth. After considering the totality of the evidence, the jury found defendant guilty on all counts. The trial court sentenced him to seven concurrent life sentences.

¶ 3        Defendant appeals, raising three claims of error. First, he argues his trial counsel was ineffective when she (1) failed to move to strike objectionable testimony from the victim, (2) elicited further prejudicial testimony from the victim, and (3) failed to object to inadmissible hearsay evidence presented by defendant's daughter. Second, defendant claims the State failed to sufficiently prove the factual allegations set forth in one of the charged offenses. And third, defendant claims three of his imposed life terms violate the proportionate penalties clause. After our review of the issues presented, we reduce three of defendant's convictions and reduce the three associated sentences to the maximum terms allowable. Otherwise, we affirm the trial court's judgment.

¶ 4                              I. BACKGROUND

¶ 5                              A. The Charges

¶ 6        In September 2016, the State filed seven counts of predatory criminal sexual assault of a child against defendant in violation of 720 ILCS 5/11-1.40(a)(1) (West 2016). In count I, the State alleged defendant committed the offense in or about August 2016 by inserting his finger into the sex organ of J.A., a child under the age of 13. In counts II and III, the State alleged defendant committed the offense in or about 2015 or 2016 by inserting his finger into the sex organ of J.A. In counts IV, V, and VI, the State alleged defendant committed the offense in or about 2015 or 2016 by using his hand to pat J.A.'s sex organ for the purpose of his sexual gratification or arousal. In count VII, the State alleged defendant committed the offense in or about 2015 or 2016 by placing J.A.'s foot against his sex organ for the purpose of his sexual gratification or arousal. All counts

indicated defendant would be sentenced to a term of natural life in prison due to his prior conviction of criminal sexual assault in Piatt County, case No. 1992-CF-56. See 720 ILCS 5/11-1.40(b)(2) (West 2016).

¶ 7                                    B. Pretrial Motions

¶ 8        Prior to trial, the State filed a motion *in limine*, seeking to admit testimony of defendant's daughter, Angela, who was now 38 years' old. The State proposed Angela would testify defendant sexually abused her in 1991 and 1992—offenses that were the subject of defendant's Piatt County case No. 1992-CF-56. In that Piatt County case, in 1993, defendant was convicted of six counts of sexual misconduct after a jury trial. The State alleged these crimes against Angela were sufficiently similar to the acts he allegedly committed against J.A. and the probative nature of which outweighed any prejudicial effect. The State sought to present Angela's testimony to show defendant had the propensity to commit sex offenses with minor females. See 725 ILCS 5/115-7.3 (West 2016).

¶ 9        The State also filed a motion *in limine* pursuant to 725 ILCS 5/115-10 (West 2016) seeking to admit J.A.'s statements to (1) Robyn Carr of the Children's Advocacy Center of East Central Illinois (CAC) made on September 6, 2016, (2) Noelle Cope, a sexual assault nurse practitioner at Sarah Bush Lincoln Health Center made on September 22, 2016, (3) Jessica Cuttill, J.A.'s cousin, (4) Raven Grider, J.A.'s cousin, (5) Cheryl Allen, J.A.'s mother, and (6) Margaret Grider, J.A.'s grandmother and defendant's girlfriend.

¶ 10        After a June 2017 hearing, where the trial court heard testimony from Carr, Cope, Cuttill, Grider, Allen, and Grider and arguments from counsel on allowing the other-crimes evidence related to Angela, the trial court allowed the State's section 115-10 motion but took the motion on other-crimes under advisement. The court granted the State's request to allow J.A. to

testify at trial via closed circuit television. The court found the time, content, and circumstances of the statements to the above-named witnesses provided sufficient safeguards of reliability. The court further found the statements were spontaneous and largely consistent with each other.

¶ 11    On July 6, 2017, the trial court announced its decision it would allow the State's motion to admit Angela's testimony at trial. The court found the circumstances of defendant's conduct toward Angela 25 years prior was sufficiently similar to his charged conduct to justify the admission of this other-crimes evidence.

¶ 12                                C. The Jury Trial

¶ 13    The jury trial lasted four days with both parties calling several witnesses. The victim, J.A., testified in a separate courtroom by closed-circuit television outside the presence of defendant and the jury. Defendant did not testify. We will summarize the State's evidence as follows.

¶ 14                                1. Testimony of J.A.

¶ 15    J.A. testified about often sleeping at her grandmother's (Grider) house in Oakland. J.A. said when she stayed overnight, she slept in the middle of the bed between Grider and defendant. She testified defendant touched her on her "private" with his hand. His finger went inside her "private" "a lot." She said she sometimes "peed the bed" so she wore a diaper as a precaution. Counsel asked if defendant's hand ever went inside of the diaper. J.A. said she did not know. She said defendant would grab her foot and put it against his "private." She said defendant was wearing underwear but "[t]here was a wet spot in it." J.A. testified she told defendant to stop but he told her he thought it would help her sleep.

¶ 16    On cross-examination, J.A. testified she talked to Jessica, Raven, her mother, a nurse, and the prosecutor about defendant's touching. She said defendant touched her 90 times.

- 4 -

She later said he touched her 30 times. She said she spoke with her mother about it five times. They did not speak about it at home on the morning of trial or in the car on the way to the courthouse.

¶ 17 On redirect, J.A. said no one has ever told her what to say about defendant touching her. When asked how many times defendant put his finger inside her private area, J.A. said "probably about 20." She said he patted her private less than five times. She said he made her foot touch his private one time. The following exchange occurred:

"Q. Once. Just once okay.

Now, [J.A.], you were talking a little bit about your imaginary friends. What were their names again?

A. Alizzy and Petunia.

Q. Okay. And the things that you told us here today, are these things that actually happened to you, or did they happen to somebody else?

A. It happened to five more people too.

Q. Okay.

A. Well, not all this stuff happened to me, but some of it.

Q. Okay. So what all happened to you? Did—did—did [defendant] put his hand in your—

A. Yes.

Q. —diaper happen to you?

A. (Nods in the affirmative.)

Q. Okay. And did his—when he patted your private, did that happen to you?

A. (Nods in the affirmative.)

Q. Okay, and all of those were yes's?

A. (Nods in the affirmative.)

Q. Okay. Those are all my questions."

On re-cross examination, counsel asked the following questions:

"Q. Who are the five more people that these things happened to?

A. [Defendant]'s daughter, his sister, and I don't know who the other one is. My mommy—I heard it on the phone when mommy was on it. Then she told me.

Q. Has anything like this ever happened to Alizzy or Petunia?

A. No."

### 2. Testimony of Cheryl Allen

¶ 18     The State next called Cheryl Allen, J.A.'s mother and Grider's daughter. Allen testified she had known defendant for 13 to 15 years as Grider's boyfriend. When asked whether she had learned of information regarding "something bad" that had happened to J.A., Allen said in August or September 2016, her sister Jennifer told her what Jennifer's daughter, Jessica, had been told by J.A. Allen said she then "pulled [J.A.] aside and asked her about it." Allen, with her fiancé Cy Crawford, asked J.A. "all kinds of questions to try to figure out *** what happened." Allen said J.A. told her defendant put his hand down J.A.'s diaper and "patt[ed] her private" while she was sleeping in her grandmother's bed, laying between her grandmother and defendant. Allen said J.A. "wasn't really very confident on how many times" it happened. According to Allen, J.A. told her she would just lay there while defendant touched her. J.A. told Allen she had once told defendant to stop but he said, " 'No, this helps you go to sleep.' " After speaking with J.A., Allen said she contacted the police and filed a report.

¶ 19        Allen testified she had spoken with J.A. "off and on" about the incidents but, she insisted she never coached J.A. on what to say. Allen said J.A. participates in a program called Growing Strong, a counseling service for sexual assault victims.

¶ 20        On cross-examination, Allen admitted "there was animosity" between her and defendant. Defendant started dating her mother at the time Allen was dating defendant's son. Allen described the situation as "a little awkward" and admitted she was not "happy about it." However, Allen testified that, "before [J.A.] decided to open up, [she] and [defendant] [were] really bonding and having a relationship."

¶ 21                                3. Testimony of Jessica Cuttill

¶ 22        Jessica Cuttill, J.A.'s 14-year old cousin, testified that on August 31, 2016, she, J.A., and Jessica's 11-year old brother were sitting in the front seat of a stationary pick-up truck. J.A. turned to Jessica and said she had something to tell her. According to Jessica, J.A. said when she went to bed at her grandmother's house, defendant " 'touche[d] her in places that she doesn't like to be touched.' " Jessica said J.A. identified the "places" as her " 'private places,' " as she pointed to her genital area. Jessica's brother apparently did not hear the conversation because he was wearing headphones. A few days later, Jessica was in a vehicle with J.A. and their cousin Raven while their grandmother drove. Jessica overheard J.A. tell Raven about defendant touching her " 'in private places.' " Her grandmother had the radio loud, so Jessica said her grandmother did not hear J.A.'s conversation with Raven. Jessica told her mother about J.A. when Jessica arrived home.

¶ 23                                4. Testimony of Detective Nicholas Clapp

¶ 24        Nicholas Clapp, a detective for the Coles County Sheriff's department, testified he observed the CAC interview of J.A. on September 6, 2016. He and detective David Pickering were

assigned to investigate J.A.'s allegations. Clapp said he secured an arrest warrant on September 7, 2016, and then served the warrant on September 8, 2016. He continued his investigation and on September 19, 2016, he and Pickering executed the search warrant at defendant's residence and took possession of two computers.

¶ 25     Clapp testified he interviewed defendant on September 22, 2016. As part of his investigation, he reviewed jail telephone recordings. He identified Grider's and defendant's voices on two recordings played for the jury. On the one recording, defendant told Grider "what happened," but said it was an accident. He said it was not for self-gratification. He said he was rubbing J.A.'s back and rubbing her leg also. He said J.A. was wearing a diaper and when she moved, he "accidently hit in there" but he did not "know what [he] hit. It was that quick."

¶ 26                          5. Testimony of Raymond Gondek

¶ 27     Raymond Gondek, the Illinois State Police computer forensics expert, testified he found no child pornography images on either of defendant's two computers. Gondek testified he also examined the searches conducted on these computers. For example, beginning in March 2015 and continuing through October 2015, the user of the Acer laptop had entered the following search terms, some more than once:  "a real young girl," "eight yo daughter friends," "daddy fucks hot stepdaughter," "young teeny gets molested and fingered," "dad's hot stepdaughter runs around in her nightie," "stepdad took my cherry," and  "grandpa fucks son's hot young daughter." On cross-examination, Gondek acknowledged the computer was password protected and he did not know who entered the searches.

¶ 28                          6. Testimony of Margaret Grider

¶ 29     Margaret Grider testified she and defendant had lived together and been in a relationship for 15 years. J.A. is her granddaughter. Prior to August 2016, J.A. would stay

- 8 -

overnight with her at least twice a month, sleeping in the same bed with her and defendant. In August 2016, prior to her telling anyone else, J.A. told Grider defendant had touched her. However, Grider did not ask any questions nor contact authorities.

¶ 30 Grider testified there were three computers in their home. She had her own laptop. Defendant had his own laptop. They shared the desktop. Both laptops were password protected. She thought she had used defendant's laptop maybe twice since 2015. He would enter the password for her to allow access. In September 2016, she recalled giving investigators defendant's laptop and the desktop. Her laptop had been dropped and shattered approximately four months prior. She denied conducting any of the searches set forth above found on defendant's laptop.

¶ 31 7. Testimony of Noelle Cope

¶ 32 The State's expert, Noelle Cope, a nurse practitioner at Sarah Bush Lincoln Health Center, testified she works in pediatrics and performs sexual-abuse exams. On September 22, 2016, she examined J.A. at the request of J.A.'s mother and a representative from CAC. J.A. told Cope she knew she was being examined because " 'Uncle Kevin had done some bad things.' " When Cope asked J.A. to describe those "bad things," J.A. said he "had touched her 'pee pee with his bare hands' " underneath her underwear. This occurred at her grandmother's house at night in her grandmother's bed. J.A. told Cope defendant had said it would help her fall asleep. J.A. also told Cope defendant would put her feet on his " 'pee pee' " and afterward, her feet would be " 'slimy.' " J.A. said she told defendant to stop. J.A. told Cope the touching started when she was five years old and continued until present. After the first time, J.A. said she had told her grandmother but, her grandmother accused her of lying, so she was afraid to report it thereafter. J.A. said she later told her cousins, who, in turn, told J.A.'s aunt. Her aunt told her mother. Her mother then sat her down and asked for more information. Cope said her physical examination of

J.A. was normal, which Cope expected based on the nature of J.A.'s description of defendant's touching and rubbing.

¶ 33 The State then indicated to the trial court it was calling its next witness. The court then admonished the jury defendant had been involved in conduct other than that charged in this case. The evidence would be received on the issue of defendant's propensity to commit a sex offense. The court admonished the jury this evidence could be considered only for that limited purpose.

¶ 34 8. Testimony of Angela Smith

¶ 35 Angela Smith, defendant's 39-year-old daughter, testified that in 1991, at the age of 13, she moved from Texas living with her mother to Bement, Illinois in Piatt County to live with defendant. On three occasions between November 1991 and sometime in 1992, either while sleeping in defendant's bed or while in the living room, defendant pulled down her underwear, rubbed her vagina with his hand, and rubbed his penis against her buttocks until he ejaculated. These incidents were eventually reported to the Piatt County Sheriff's department and, as a result, Smith moved back to Texas. Smith said she met with defendant in 2013. He reportedly told her "the reason why he did what he did in [19]92 was because he thought [she] loved him in a different way." He also told her she "would be teasing him" when she came out of the bathroom after showering without clothes on. She said she was "a very modest person" and did not recall doing so.

¶ 36 9. Testimony of Robyn Carr

¶ 37 Robyn Carr, the senior forensic interviewer at CAC, testified she interviewed J.A. on September 6, 2016. In the observation room was Pam Riddle, the CAC executive director, Julie

Nelson from Illinois Department of Children and Family Services, and detectives Clapp and Pickering. The recorded interview was played for the jury.

¶ 38 In this recording, Carr interviews J.A., then age 7. Carr asked J.A. if she knew why J.A. was there and J.A. said because "inappropriate" things happened. J.A. explained she would sometimes spend the weekend at "grandma's" in Oakland. At bedtime, J.A. would lay in bed with her grandmother and watch television. J.A. typically wore a "pajama dress" and underwear. Defendant would come to bed after J.A. had fallen asleep. J.A. slept in the middle between her grandmother and defendant. J.A. said defendant would rub her "private" and sometimes "pat it." She identified her vaginal area as her "private." She said he rubbed it on the inside and the outside. When he rubbed it on the inside, it hurt her. She said defendant would rub or pat her with his bare hand inside her underwear. She said she was too scared to tell anyone, so she laid there with her eyes closed.

¶ 39 J.A. said defendant's abuse began when he and her grandmother moved to Oakland. She said it happened in bed "about 100 times." She said she told defendant to stop one time when "she was a little brave." He told her he thought it would help her sleep. She said she just ignored that comment. She said he took her foot "a lot" and touched his "private and jiggle[d] it around." She said she could feel when his "pee comes out and he sighs." She said sometimes her foot touched his skin and sometimes she could feel his underwear; it was "wet and slimy."

¶ 40 At the close of this evidence, the State rested. Defendant moved for a directed verdict, but the trial court denied the same. Defendant presented one witness.

¶ 41 Testimony of Margaret Grider

¶ 42 Grider said when she, J.A., and defendant slept in the same bed, J.A. moved around during the night in bed. She said most of the time, the dog slept between defendant and J.A. Grider

- 11 -

testified her daughter (J.A.'s mother Cheryl) was unhappy that Grider was dating defendant because Cheryl had dated defendant's son.

¶ 43        After deliberations, the jury found defendant guilty of all seven charged offenses. Defendant filed a motion for acquittal or, in the alternative, motion for a new trial, claiming (1) the trial court erred allowing the admission of certain evidence, (2) the trial court erred by denying defendant's motion for a directed verdict at the close of the State's case and at the close of all evidence, and (3) the evidence was insufficient to convict him beyond a reasonable doubt.

¶ 44        On September 27, 2017, the trial court conducted a hearing on defendant's posttrial motion. Finding "the trial proceeded without error, and that the evidence presented supported the verdict reached by the jury," the court denied defendant's motion. The court proceeded to sentence defendant to seven concurrent life terms. Defendant filed a motion to reconsider sentence, claiming his sentence was excessive and unconstitutional. The court denied the same.

¶ 45        This appeal followed.

¶ 46                         II. ANALYSIS

¶ 47                  A. Ineffective Assistance of Counsel

¶ 48        Defendant claims his counsel rendered ineffective assistance. He points to two instances of alleged ineffectiveness and argues that, not only does each instance independently demonstrate unreasonable representation, but cumulatively, these acts more than likely adversely affected the outcome of the trial. We will address each claim in turn.

¶ 49        This court evaluates ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). For a successful ineffective assistance of counsel claim, a defendant must demonstrate (1) defense counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant.

*Strickland*, 466 U.S. at 687. See also *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Further, the defendant must overcome the strong presumption the challenged action or inaction was the result of sound trial strategy. *Id.* "In recognition of the variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' " *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002).

¶ 50        To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Id.* Additionally, the *Strickland* Court noted that, when a case is more easily decided on the ground of lack of sufficient prejudice rather than that counsel's representation was constitutionally deficient, the court should do so. *Strickland*, 466 U.S. at 697. When, as here, a claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo*. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 46.

¶ 51                        1. Failure to Object to J.A.'s Testimony

¶ 52        Defendant first contends his attorney was ineffective for failing to object to or move to strike J.A.'s trial testimony that five other people had been sexually abused by defendant. The State asked J.A. whether the sexual abuse she had previously described "actually happened to [her], or did they happen to somebody else." J.A. responded: "It happened to five more people too." Without objecting, defendant's attorney then asked J.A. the following: "Who are the five

- 13 -

more people that these things happened to?" J.A. named two: defendant's daughter and defendant's sister. She said: "I don't know who the other one is. My mommy—I heard it on the phone when mommy was on it. Then she told me." Defendant argues this "improperly admitted evidence changed the whole dynamic of [defendant]'s trial."

¶ 53 Defendant argues his attorney allowed the admission of this other-crimes evidence knowing the prejudicial effect it could have on the jury. Defendant explains, at the hearing on the State's motions *in limine*, defense counsel had argued that allowing Angela's testimony of prior sexual abuse by defendant would cause the jury to "assume he's guilty of the present offense if they hear that." Given counsel's obvious awareness of the prejudicial effect of such testimony, defendant claims there is "no reasonable explanation for her failure to object" to this arguably inadmissible propensity testimony.

¶ 54 We cannot say counsel's decision constitutes deficient representation. Our supreme court has recognized that an attorney may forego an objection or a motion to strike for strategic reasons. *People v. Evans*, 209 Ill. 2d 194, 221 (2004); *People v. Leger*, 149 Ill. 2d 355, 396-97 (1992); *People v. Owens*, 372 Ill. App. 3d 616, 625 (2007). A strong presumption exists that counsel's action or inaction was the product of sound trial strategy. *People v. Davis*, 2014 IL App (4th) 121040, ¶ 19. Generally, matters of trial strategy include what motions to make, whether to object, and what instructions to tender. *People v. Jura*, 352 Ill. App. 3d 1080, 1093, 817 N.E.2d 968, 980–81 (1st Dist. 2004) Moreover, "a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80. Instead, a reviewing court is to be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from [her] perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill.

2d 312, 344 (2007). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Fuller*, 205 Ill. 2d at 331.

¶ 55    The context of J.A.'s testimony is important and may shed light on the possibility that counsel's conduct involved trial strategy. On redirect examination, the prosecutor asked J.A. to tell him how many times defendant had performed various acts. She said defendant put her foot on his "private" one time. The following exchange occurred:

"Q. Once. Just once okay.

Now, [J.A.], you were talking a little bit about your imaginary friends. What were their names again?

A. Alizzy and Petunia.

Q. Okay. And the things that you told us here today, are these things that actually happened to you, or did they happen to somebody else?

A. It happened to five more people too."

Defendant's counsel did not object. On re-cross examination, she asked J.A. to identify those five people. Counsel may have anticipated J.A. would name her cousins with whom she had a close relationship and in whom she had confided, knowing they had not complained of abuse. It is also possible, based on counsel's next question, that she anticipated J.A. to say "these things" had also happened to her imaginary friends. After J.A. identified two of the five individuals, counsel asked: "Has anything like this ever happened to Alizzy or Petunia?" If she had received an affirmative response from J.A., counsel may have anticipated she could have argued J.A.'s allegations were imaginary as well.

¶ 56        By posing these questions and venturing into seemingly unchartered territory, it is reasonable to assume it involved trial strategy designed to challenge J.A.'s credibility. We find no indication that counsel did not understand the implications of admitting other crimes. As defendant even points out, counsel had argued against the admission of other crimes a few weeks earlier at the hearing on the State's motion *in limine*. She was well aware of the negative implications and potential prejudice to defendant of allowing the admission of propensity evidence at trial. Based on the record before us, we conclude defendant cannot overcome the strong presumption that defense counsel took a calculated and informed risk during this line of questioning.

¶ 57        Even assuming counsel's conduct can be characterized as unreasonable, we cannot say this error prejudiced defendant. When counsel asked J.A. to name the five people to whom she referred had been abused by defendant, she named two: defendant's daughter and sister. J.A. did not name the others. The trial court had already decided the jury would hear testimony from defendant's daughter about the abuse she had suffered. There was no further mention or reference made for the remainder of the trial about defendant's sister. Given the totality of the evidence against defendant, it is highly unlikely the jury found defendant guilty of seven counts of abuse solely because J.A. mentioned defendant's sister as a potential victim. Accordingly, we conclude, even if we assume trial counsel could have excluded J.A.'s testimony regarding five other victims, there is not a reasonable probability that the result of the trial would have been different.

¶ 58                        2. Failure to Object to Angela's Testimony

¶ 59        Defendant also contends his counsel was ineffective for failing to object to Angela's testimony regarding her 2013 meeting and subsequent telephone calls with defendant. He claims Angela testified, without objection, to "deeply disturbing and inadmissible conversations," referring to the following statements. Angela testified that, during a telephone

conversation, defendant told her "the reason why he did what he did in [19]92 was because he thought [she] loved him in a different way." She further testified that "he also stated that when [she] was younger, and [she] would take a shower, [she] would come out and [she] would be naked and [she] would be teasing him." And finally, she testified that, during their 2013 meeting, defendant asked her to stay the night with him, but she declined.

¶ 60　　　　Defendant claims these statements were hearsay and outside the subject matter of Angela's pre-determined admissible testimony. During a pretrial hearing, the trial court determined Angela could testify in this trial about the occasions of abuse to which she had testified at defendant's 1993 trial because the allegations were sufficiently similar. See 725 ILCS 5/115-7.3(c)(2) (West 2016). However, defendant claims, Angela's testimony regarding her 2013 and subsequent conversations with defendant were inadmissible hearsay and outside the scope of admissible evidence. Defendant argues his attorney rendered ineffective assistance when she failed to object to this inadmissible hearsay.

¶ 61　　　　The hearsay rule generally prohibits the introduction of an out-of-court statement offered to prove the truth of the matters asserted. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 18. Unless hearsay falls within an exception to the hearsay rule, it is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). The State suggests Angela's testimony falls within the admission-by-party-opponent exception. We disagree.

¶ 62　　　　The party-admission doctrine allows the admissibility of a party's own statement *if it is relevant to an issue in dispute*. *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 68. The substance of defendant's alleged statements to Angela did not make the issue of whether defendant abused J.A. any more or less probable. *Id.* (relevant evidence has a tendency to make the existence

of a fact more or less probable than without the evidence). We find this exception does not apply to these circumstances. Angela's testimony was inadmissible hearsay and defendant's attorney should have objected.

¶ 63    Thus, regarding the first prong of the *Strickland* test, counsel's failure to object to Angela's recantation of her conversations with defendant about his 1991 abuse of her shows counsel's representation fell below an objective standard of reasonableness. While there is a strong presumption that a trial counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action or inaction was the product of sound trial strategy (see *Strickland*, 466 U.S. at 689), we can see no strategic reason for counsel's failures here.

¶ 64    However, regarding the second prong of the *Strickland* test, we find defendant is unable to demonstrate prejudice, as the evidence presented against defendant was overwhelming. First, the jury heard evidence, in the form of the jail telephone call, from defendant himself that "it happened," that he touched J.A. under her diaper. Second, J.A. told her grandmother, her mother, her cousin, the CAC advocate, the nurse practitioner, and the jury similar accounts of defendant's abuse. Third, the investigating officers found telling searches on defendant's computer. And finally, the nature of the hearsay evidence was defendant's purported explanations of his abuse toward Angela—conduct for which he had already been convicted. That is, defendant's reasons or explanations for abusing Angela would not likely otherwise convince the jury he had abused J.A. We find the trial evidence cannot be characterized as closely balanced such that the improper admission of hearsay likely changed the outcome of the trial. By not sufficiently demonstrating prejudice, defendant could not satisfy the second prong of the *Strickland* analysis, and accordingly, could not sufficiently demonstrate counsel was ineffective.

¶ 65    B. Sufficiency of the Evidence

- 18 -

¶ 66     Defendant also contends the State failed to sufficiently prove his guilt beyond a reasonable doubt as to the allegations set forth in count VII. In that count, the State alleged defendant committed predatory criminal sexual assault of a child in that he "committed an act of contact, however slight, between his sex organ and the foot of J.A., who was under 13 years of age when the act was committed, *** in that said defendant placed J.A.'s foot against his sex organ for the purpose of sexual gratification or arousal of the defendant." Defendant claims the State failed to establish that his sex organ made "contact" with J.A. because, according to J.A.'s testimony at trial, defendant was wearing underwear at the time. Defendant claims the State should have instead charged him with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2016)), a Class 2 felony, which requires only sexual "conduct," not "contact."

¶ 67     Section 11-1.40(a)(1) of the Criminal Code of 2012 states a defendant "commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, *** and [] the victim is under 13 years of age[.]" 720 ILCS 5/11-1.40(a)(1) (West 2016). Although the statute does not define "contact," we can determine from the plain language of the statute, including the phrase "however slight," that "contact" encompasses any touching. See *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 51 (the ordinary and popularly understood meaning of "contact," as ascertained from a contemporary dictionary, encompasses any type of touching).

¶ 68     Defendant is correct that J.A.'s trial testimony alone may not have been sufficient to establish "contact," within the meaning of the statute, between defendant's sex organ and her foot. At trial, the following exchange occurred:

        Q. *** How would he get your foot against his private?

- 19 -

A. He would grab it.

Q. Your foot?

A. (Nods in the affirmative).

Q. And then would he—would he make it touch the skin of his private? Was he wearing underwear or shorts or something?

A. He was wearing underwear.

Q. Okay. Did the skin of your foot ever touch the skin of his private?

A. (Nods in the negative)."

¶ 69     However, the State also introduced J.A.'s recorded interview, which was admitted as substantive evidence. In the recorded interview, J.A. stated: "He put it [(her foot)] on his weenie." Carr asked J.A. if her foot "touched on his underwear or the skin of his private." J.A. said, "[s]ometimes the skin of his private." A reasonable jury could properly have found J.A.'s statement to Carr credible.

¶ 70     It is not the function of this court to second-guess the credibility determinations of the jury unless we determine no reasonable jury could have come to that same conclusion. *People v. Lara*, 2011 IL App (4th) 080983-B, ¶ 57. As our supreme court has stated, "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole" as long as its judgment is reasonable in light of the record. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Here, we find the jury's decision to believe J.A.'s statement that defendant placed her foot on the skin of his sex organ and that he did so for the purpose of his sexual gratification or arousal was reasonable. We conclude the evidence was sufficient to support defendant's conviction on this particular offense.

¶ 71     C. Violation of Proportionate Penalties Clause

- 20 -

¶ 72 Defendant also claims the life sentences imposed on counts IV through VI, which each charged him with predatory criminal sexual assault of a child, a Class X felony, violated the proportionate penalties clause because that offense, as charged and at the time he committed the offense, had the same elements as aggravated criminal sexual abuse, a Class 2 felony, requiring a sentence of three to seven years.

¶ 73 A person commits predatory criminal sexual assault of a child, a Class X felony, when (1) he is at least 17 years of age, (2) commits an act of *contact*, however slight, between the sex organ or anus of one person and the part of the body of another, (3) for the purpose of sexual gratification or arousal, and (4) the victim is under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2016). A person commits aggravated criminal sexual abuse, a Class 2 felony, when (1) he is at least 17 years of age, (2) commits an act of sexual *conduct*, and (3) the victim is under 13 years of age. 720 ILCS 5/11-1.60(c )(1) (West 2016).

¶ 74 The only distinction between the offenses is the former requires an "act of contact" and the latter an "act of sexual conduct." As we stated in our analysis above, "contact" is not defined in the statute but, given its ordinary meaning, it means any touching. See *Kitch*, 2019 IL App (3d) 170522, ¶ 51. "Sexual conduct" is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2016).

¶ 75 In counts IV through VI, the State charged defendant with predatory criminal sexual assault of a child when he "patted the sex organ of J.A. with his hand for the purpose of sexual

gratification or arousal of the defendant." We agree this conduct, as alleged, also meets the elements of aggravated criminal sexual abuse. That is, defendant was charged with the Class X felony when he could have been charged with the Class 2 felony for the same conduct as alleged in counts IV through VI. The two offenses have identical elements when applied to the facts alleged. Accordingly, defendant's convictions for the Class X felonies of predatory criminal sexual assault on counts IV through VI are vacated and convictions for the Class 2 felonies of aggravated criminal sexual abuse are imposed. See Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967) (a reviewing court may reduce the degree of the offense for which the appellant was convicted). See also *People v. Kennebrew*, 2013 IL 113998, ¶ 21.

¶ 76          The trial court sentenced defendant to multiple life sentences. During the sentencing hearing, the court stated: "With respect to counts II through VII, I sentence you to a term of natural life in person without the possibility of parole. Those sentences to merge with the sentence of natural life in count I."

¶ 77          As our supreme court as held, aggravated criminal sexual abuse is a lesser-included offense of predatory criminal sexual assault. *Kennebrew*, 2013 IL 113998, ¶ 47. That is, there is no doubt a jury would have found defendant guilty of aggravated criminal sexual abuse on counts IV through VI since the jury found him guilty of predatory criminal sexual assault of a child on the same facts. Any convictions on these lesser charges would have no effect on the convictions and sentences imposed on counts I, II, III, and VII, wherein defendant was found guilty of predatory criminal sexual assault of a child. At sentencing, the trial court had no choice but to sentence defendant to a minimum mandatory term of natural life in prison due to his prior conviction of criminal sexual assault. See 720 ILCS 5/11-1.40(b)(2) (West 2016) (a defendant who is convicted of the offense of predatory criminal sexual assault of a child after having previously

been convicted of the offense of criminal sexual assault shall be sentenced to a term of natural life in prison). After this direct appeal, at least one of defendant's convictions for predatory criminal sexual assault remains unchallenged. Based on these facts, it would be an exercise in futility to remand for re-sentencing on convictions for the Class 2 felonies of aggravated criminal sexual abuse on counts IV through VI when a life sentence on at least one conviction of predatory criminal sexual of a child remains valid. Thus, pursuant to Illinois Supreme Court Rule 615(b)(4), we reduce defendant's life terms imposed on counts IV through VI to three concurrent terms of seven years, the maximum terms allowable for the Class 2 felonies of aggravated criminal sexual abuse. 720 ILCS 5/11-1.60(g) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016).

¶ 78                                III. CONCLUSION

¶ 79        For the foregoing reasons, we vacate defendant's convictions and sentences for predatory criminal sexual assault on counts IV, V, and VI, enter convictions on those counts for aggravated criminal sexual abuse, and reduce defendant's sentences on counts IV, V, and VI to three concurrent seven-year terms. Otherwise, we affirm the trial court's judgment.

¶ 80        Affirmed in part, vacated in part, judgment modified.